STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

TRAVIS HAROLD MICHAEL WIRFS,
*Defendant-Appellant.*

Lane County Circuit Court
200909283; A143423

281 P3d 616

Peter Gartlan, Chief Defender, Office of Public Defense Services, and Zachary Lovett Mazer, Deputy Public Defender, filed the brief for appellant.

John R. Kroger, Attorney General, Mary H. Williams, Solicitor General, and Jeremy C. Rice, Assistant Attorney General, filed the brief for respondent.

Before Schuman, Presiding Judge, and Wollheim, Judge, and Nakamoto, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant was convicted of one count of second-degree sodomy, ORS 163.395, and two counts of third-degree sodomy, ORS 163.385. On appeal, he advances five assignments of error. Specifically, in his first assignment of error, he argues that a state's witness improperly commented on the credibility of the complainant. In his second assignment of error, he contends that it was error for the trial court to conclude that he was fit to proceed to trial. In his third and fourth assignments of error, he argues that the trial court erred in sustaining the state's objections to two of defendant's questions on redirect examination of his expert witness. Finally, in his fifth assignment of error, he contends that it was unconstitutional for the jury to convict him with less than a unanimous verdict. We conclude that the trial court erred in preventing defense counsel from asking questions on redirect examination of defendant's expert. Accordingly, we reverse and remand on that basis and decline to reach defendant's first, second, and fifth assignments of error.

Because defendant was convicted, we summarize the facts in the light most favorable to the state. *State v. Vidal*, 245 Or App 511, 513, 263 P3d 364 (2011), *rev den*, 351 Or 761 (2012). The complainants, AS and AL, are stepbrothers and were 14 and 12 years old, respectively, at the time of the incidents. According to AS, while he spent the night at defendant's home, he awoke to find defendant performing oral sex on him. On another occasion, both AS and AL spent the night at defendant's home and both testified that defendant performed oral sex on both of them as they slept.

After the incidents, AS and AL teased each other about being homosexual. When their parents confronted them about the teasing, each complainant denied having sexual contact with defendant, but claimed the other had had sexual contact with defendant. The parents became concerned and called the police. Detective Martin met the family at the Kids First Center, a child abuse assessment center. During interviews with counselors at the Kids First Center, AS denied that defendant had sexually abused him, but claimed that defendant performed oral sex on AL. Likewise,

AL denied that defendant had sexually abused him, but claimed that defendant performed oral sex on AS. Martin told the family that he could not pursue the investigation any further based on the boys' statements.

About a month later, AS told his mother that defendant had performed oral sex on him. The complainant's mother took AS to the police station where Martin interviewed him. AS told the detective that he had lied during his interview at the Kids First Center and that defendant had performed oral sex on him while he slept at defendant's home. Martin contacted defendant and interviewed him at the police station. Defendant denied any sexual contact with AS, saying that AS may have misunderstood defendant patting AS's stomach as his way of saying goodnight. Defendant was not arrested that day, but he agreed to meet with another detective from the Oregon State Police two days later. At that interview, defendant confessed to having performed oral sex on AS on three separate occasions and on AL once. Detectives recorded defendant's confession. After learning of defendant's confession, AL admitted to Martin that defendant had sexually abused him. When asked why he had not disclosed the abuse at the Kids First Center earlier, AL said that he had lied because he was embarrassed.

Defendant was arrested and charged with one count of second-degree sodomy, ORS 163.395, and two counts of third-degree sodomy, ORS 163.385. At trial, Martin, AS, and AL testified for the state. The state also played for the jury defendant's tape-recorded confession. Defendant's theory of the case was that none of the witnesses had told consistent stories about what had happened when AS and AL spent the night at defendant's home and that his own confession was unreliable, raising a reasonable doubt that he had committed the crimes charged.

To rebut his confession, defendant called Dr. Truhn, a psychologist, to testify that defendant suffers from a pervasive developmental disorder not otherwise specified (NOS), alcohol abuse, and a psychotic disorder NOS. According to Truhn's testimony, a person with a pervasive developmental disorder, when confronted by an authority figure,

does not have adequate coping mechanisms and is susceptible to acquiescing in the authority figure's demands. The trial court and the parties had Truhn's report before them as an exhibit during Truhn's testimony, and the report was marked for identification and is part of the appellate record. However, the report was not admitted as evidence for publication to the jury. Within the report, Truhn wrote that defendant's IQ was 96, which placed him in the 39th percentile and was average for a person his age. His report went on to conclude that, "socially, [defendant] is much younger than his chronological age. Intellectually and cognitively[,] his functioning appears to be consistent with his chronological age. The [psychological tests] do indicate that [defendant] is functioning socially in interpersonal relationships at about the eight to nine year old level." During trial, Truhn testified that defendant's social-functioning age was approximately that of a child between eight and 10 years old. On cross-examination, the state asked Truhn whether he concluded in his report that defendant had adequate intelligence and cognitive skills. Truhn replied yes.

On redirect, defense counsel first asked Truhn to turn to page 11 of his report and to read "the sentence directly above the phrase the prosecutor used to ask you about [defendant]'s intellectual and cognitive age." The state requested some time to refer to that page before defense counsel continued his redirect examination. Then defense counsel asked, "Is someone's social age sometimes different from their intellectual age, Doctor?" The state objected to the question on the ground that it was outside the scope of cross-examination, and the court sustained the objection. Defense counsel then asked whether people who have social difficulties sometimes have normal intelligence. The state objected again on the same basis, and the trial court sustained the objection. At closing, the state told the jury:

> "[Truhn] did the testing and he told you what the results of the testing were. And the sum and substance of all of that, at least as they tried to emphasize in his testimony, was that the defendant, while he has average cognitive abilities, thought processes, et cetera, emotionally he's more immature than other 21 year-old guys.

"With the hopes that the suggestion of that immaturity would allow them to argue that when he made those statements to the detectives, he was too immature to know what he was doing. He was too immature perhaps to appreciate the consequences of what he was doing. He was too immature certainly to withstand * * * the barrage of questioning by the detectives to elicit the answers that they wanted. And only the answers that they wanted."

Ultimately, the jury found defendant guilty on all counts.

On appeal, defendant combines his arguments for his third and fourth assignments of error, arguing that it was error for the trial court to sustain the state's two objections to defense counsel's questions of Truhn on redirect examination. The state argues that defendant failed to preserve the assignments of error because he did not argue how or why the question was within the scope of cross-examination.

The state relies on *State v. White*, 119 Or App 424, 850 P2d 1158, *rev den*, 317 Or 486 (1993), in which the trial court overruled the defendant's objection to the state's line of questioning regarding defendant's consumption of alcohol. On appeal, the defendant assigned error to the trial court's overruling of his objection. We held that objecting alone was not adequate to preserve the claim of error, because it did not identify the ground on which the defendant challenged the ruling on appeal. *Id.* at 427.

The state's reliance on *White* is misplaced. Preservation policies are prudential and pragmatic in nature. *Peeples v. Lampert*, 345 Or 209, 219-20, 191 P3d 637 (2008). The purpose of preservation is to ensure fairness to an opposing party, by giving the trial court the chance to consider and rule on a contention, and allowing the opposing party to respond. *Id.* at 220. Whether a party adequately presented a contention to the trial court varies depending on the nature of the claim or argument. *Id.* In *White*, the defendant was the appellant and the party who had objected to the introduction of evidence. The defendant's failure to offer an explanation as to the basis of his objection did not give the trial court in that case the chance to consider and rule on the contention that he later raised on appeal. Here, in contrast, when the state objected to defendant's line of questioning, the

state identified the ground on which defendant is now appealing—whether the question was within the scope of cross-examination.

Similarly, the state's argument that defendant was required to make an offer of proof to preserve his arguments in this case fails, because the trial court and the prosecutor were aware of the substance of the testimony that defendant would elicit on redirect. *See State v. Olmstead*, 310 Or 455, 461, 800 P2d 277 (1990) (purposes of an offer of proof include aiding the trial court to make an informed decision and facilitation of appellate review). The situation at trial was one in which the written expert report, available to the trial court and the prosecution, foretold Truhn's answers.

Both the state and the trial court understood that, in response to defendant's questions on redirect, Truhn would testify about the contents of his report and explain that despite normal intelligence, an adult can have a pervasive developmental disorder of the type he observed in defendant. When a party assigns error to a trial court's ruling that excludes evidence, the issue is preserved if "the substance of the evidence was made known to the court by offer or was apparent from the context." OEC 103(1)(b). Before asking Truhn the question raised on appeal, defense counsel asked Truhn to turn to page 11 of his report and read "the sentence directly above the phrase the prosecutor used to ask you about [defendant]'s intellectual and cognitive age." Then the prosecutor asked for a moment to turn to that page before defense counsel asked the question that is on appeal. It was apparent from the context of the defense counsel's line of questioning that the substance of Truhn's testimony would have been related to the prosecutor's questions about Truhn's report and the legitimacy of Truhn's opinion. The state was not taken by surprise, and the trial court had a chance to consider the issue. Therefore, we conclude that defendant's arguments were preserved.

Turning to the merits of the arguments, we review a trial court's conclusion that a party's line of questioning during cross-examination exceeded the scope of direct examination for errors of law. *State v. Ramirez*, 219 Or App 598, 603, 184 P3d 1138, *adh'd to on recons*, 222 Or App 603, 195 P3d

404 (2008), *rev den*, 346 Or 158 (2009). We apply the same standard of review to a ruling foreclosing questions based on the scope of redirect examination. *See State v. Wise*, 40 Or App 303, 306-07, 594 P2d 1313 (1979) (determining that question was within the scope of redirect by citing case law concerning scope of cross-examination).

The Supreme Court explained, before the adoption of the Oregon Evidence Code, that, generally, cross-examination "should not be limited to the exact facts stated on direct examination, but [may] extend[ ] to other matters which tend to limit, explain, or qualify them, or to rebut or modify any inference resulting therefrom, provided they are directly connected with the matter stated in the direct examination." *Ritchie v. Pittman*, 144 Or 228, 231, 24 P2d 328 (1933). That broad view of the scope of cross-examination continues today under OEC 611(2).[1] *Ramirez*, 219 Or App at 602-04. We now explicitly decide that the scope of redirect examination is the same as the scope of cross-examination. Redirect may extend to the facts elicited on cross-examination; matters that tend to limit, explain, or qualify them; or matters that tend to rebut or modify any inference resulting from the cross-examination—provided that the inquiries are directly connected with the matter stated in cross-examination. *See Ritchie*, 144 Or at 231; *Wise*, 40 Or App at 306-07.

Here, defendant's questions on redirect had a tendency to rebut the state's implication that defendant's normal intelligence is proof that he was not pressured into signing a confession during his police interview. During cross-examination, the state asked Truhn about the report he submitted to the court. Specifically, the state asked whether Truhn had concluded in his report that defendant's intelligence level was adequately normal for a person his age. Within the same paragraph of the report containing that conclusion, Truhn had written that "socially, [defendant] is

---

[1] OEC 611(2) provides:

"Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

much younger than his chronological age. Intellectually and cognitively[,] his functioning appears to be consistent with his chronological age. The [psychological tests] do indicate that [defendant] is functioning socially in interpersonal relationships at about the eight to nine year old level." When defense counsel asked Truhn on redirect whether he had determined that defendant had significant difficulties dealing with social situations, in spite of his intellectual or cognitive age, he inquired about the same subject that the state inquired about on cross-examination—the conclusions in his report and their significance to the reliability of defendant's confession. That question provided additional evidence that tended to rebut or modify the state's implication, through cross-examination of Truhn, that the diagnosis was suspect or that defendant's confession during his interview with police was reliable because he had normal or adequate intelligence. Defense counsel sought to elicit similar testimony by asking whether people who have social difficulties sometimes have normal intelligence. Thus, defense counsel's questions were directly and logically connected to the cross-examination and were within the scope of redirect examination. On that basis, the trial court erred in sustaining the state's objection.

Having determined that the trial court erred, we must now determine whether that error was harmless. Evidentiary error is not presumed to be prejudicial. OEC 103(1). We will affirm a judgment despite an evidentiary error if there is "little likelihood that the error affected the jury's verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). If erroneously admitted or excluded evidence pertained to a "central fact issue," then it was more prejudicial than if the evidence pertained to tangential issues. *State v. Marrington*, 335 Or 555, 566, 73 P3d 911 (2003). Generally, erroneously admitted or excluded scientifically based testimony from an expert witness weighs against a determination that the error was harmless. *State v. Johnson*, 225 Or App 545, 555, 202 P3d 225 (2009).

Although the state contends that defendant cannot establish harm due to his failure to make an offer of proof, defendant contends that the error in excluding the evidence likely affected the verdict and was not harmless, given that

the excluded evidence was scientific in nature and highly relevant to his defense that his confession was unreliable. In this case, defendant called only one witness in his defense, Truhn. As the prosecutor argued to the jury at trial, "the entire defense in this case is Dr. Truhn's testimony." Defendant's theory of the case was that reasonable doubt about his guilt existed because none of the witnesses to the sexual encounters gave consistent statements and his confession was unreliable. Defendant, AS, and AL, at one time or another, gave inconsistent, contradictory statements to detectives, counselors, or at trial. Defendant used Truhn's testimony to argue that, because defendant has mental and psychological issues—pervasive developmental disorder NOS such that he has the social skills of an eight year-old and is susceptible to pressure from authority—his confession was unreliable. During cross-examination, the state sought to rebut defendant's theory of the case, in part, by eliciting a new piece of information from Truhn that was damaging to the defense: that defendant had a normal IQ and cognitive abilities for someone of his age. The state highlighted defendant's normal intelligence and cognitive skills during its closing argument and downplayed the significance of Truhn's testimony about defendant's diagnosis by describing defendant as "immature." By denying defendant the opportunity to have Truhn explain that an adult person who has normal intelligence can still have a developmental disorder and the social skills of a child, the trial court hobbled defendant's ability to rebut the state's argument that the jury should disregard Truhn's opinion and the theory that defendant had an impairment bearing on the reliability of his confession. *See Johnson*, 225 Or App at 555 (given the potential for scientifically based evidence to influence a jury generally, erroneous exclusion of scientifically based testimony of an expert weighs against a determination that error is harmless). Accordingly, we hold that the evidentiary error was not harmless.

Reversed and remanded.