Argued and submitted January 2, affirmed May 21, appellant's petition for review denied, respondent's petition for review allowed September 11, 2014
(356 Or 163)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SANTOS CUEVAS,
*Defendant-Appellant.*

Malheur County Circuit Court
09082394C; A149668

326 P3d 1242

Jesse Wm. Barton argued the cause and filed the brief for appellant.

Matthew J. Lysne, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.*

GARRETT, J.

_____

* Garrett, J., *vice* Duncan, J.

## GARRETT, J.

Defendant was convicted of three counts of first-degree sodomy, ORS 163.405, one count of second-degree sodomy, ORS 163.395, five counts of first-degree sexual abuse, ORS 163.427, and one count of second-degree rape, ORS 163.365. The trial court imposed consecutive sentences on all but two counts, for a total sentence of 569 months. On appeal, defendant argues that the trial court erroneously (1) allowed the state to show the jury videotaped interviews of defendant's victims; (2) allowed the state to introduce expert opinion testimony from a lay witness; (3) denied defendant's motion for a mistrial based on the state's closing and rebuttal arguments; and (4) made certain determinations at sentencing that, defendant argues, should have been submitted to the jury. We reject defendant's arguments and, accordingly, affirm the judgment.

## I. BACKGROUND

Defendant was charged with sexually abusing, sodomizing, and raping two of his stepdaughters, S and K, during the several years that he was married to their mother. S and K both came forward to describe the abuse several years after it was alleged to have occurred.

Of importance to this appeal are two videotaped interviews that S and K gave at the Sexual Trauma Abuse Response Center (STAR Center). In those interviews, both victims reported numerous instances of sexual abuse, some of which resulted in charges against defendant and some of which did not. S also referenced defendant smoking crystal methamphetamine and blowing the smoke into S's mouth; this conduct was not included in the state's charges against defendant. In the videotapes, S and K also answered personal background questions about topics including their schooling, hobbies, and pets. S and K both testified at the trial about the sexual abuse; much of that testimony reflected what they had described in the STAR Center interviews.

Before trial, defendant moved to exclude the STAR Center videotaped interviews, arguing that they contained (1) inadmissible hearsay, (2) evidence that was not relevant under OEC 402, (3) evidence that was unfairly prejudicial

under OEC 403, and (4) evidence of other prior bad acts that was not admissible under OEC 404(3). During a hearing on defendant's motion, the state conceded, and the trial court ruled, that the videotaped interview of S was hearsay and that the hearsay exception in OEC 803(18a)(b) did not apply.[1] The court then played the videotape of K's STAR Center interview for the record. At the conclusion of the video, defendant objected to several portions of the video. Specifically, defendant argued that, because the interviewer in the video had told K that, during interviews, "we always tell the truth," the STAR Center staff had effectively vouched for K's credibility. Defendant also argued that portions of the video in which K provided personal information were irrelevant and prejudicial because they had the potential to unfairly endear K to the jury. Finally, defendant argued that, to the extent K was describing crimes committed against S, the OEC 803(18a)(b) hearsay exception did not apply.

The trial court agreed that K's descriptions of defendant committing crimes against S were inadmissible hearsay and would need to be redacted. The court ruled that the other portions of the videotape were admissible under OEC 803(18a)(b), OEC 401, and OEC 403. The court explained its reasoning as follows:

"I don't view the description of the rules as being vouching. [The staff person] didn't say anything about whether she believed [K] or not, she simply said, 'These are the rules. We want you [to] tell the truth, we want you to follow these rules.' And certainly, I think it's significant and important for the jury to hear that to understand the setting for the—her later discussion. The same thing with the small talk, if you will, about who [K] is and where [K] lives and so forth. Certainly, if [the staff person] simply walked in, sat down, and says, 'Okay, tell me about your sexual abuse' the jury should have the right to understand that also. I think the jury has the right to understand the context in which these discussions took place. I don't see anything

---

[1] As we explained in *State v. Lamb*, 161 Or App 66, 71-72, 983 P2d 1058 (1999), OEC 803(18a)(b) provides that "the hearsay statements of a child victim under the age of 18 are admissible so long as the child victim testifies at the proceeding and is available for cross-examination." S was 18 years old at the time of her STAR Center interview.

prejudicial about that. They are simply, 'Where do you live? [What] are your favorite classes?' Those kinds of things. It simply sets the tone and lets the jury understand what the circumstances and the environment [were]."

The state did not introduce either videotape during its case-in-chief. During defendant's opening statement, defendant's counsel suggested that the children's mother had convinced S and K to lie about defendant's abuse because she was angry about defendant's infidelity and the fact that he had impregnated another woman. Defendant questioned Ontario Police Detective Rodriguez and criticized the police investigation as deficient in numerous respects. In particular, Rodriguez testified that police had relied almost exclusively on the STAR Center interviews and had not done follow-up interviews with S or K, their mother, defendant, or other family members.

Rodriguez responded to the state's question about the STAR Center staff's ability to investigate crimes by testifying that he "was satisfied with the interview that took place." He also explained that he had not personally interviewed S or K because he believed that they would feel uncomfortable speaking to a male police officer and that, based on his past dealings with defendant and his family, he believed that it would have been counterproductive to contact them about the investigation.

Having previously authenticated the two video-taped STAR Center interviews, the state moved to admit them on the ground that, because defendant had made an issue of the adequacy of the investigation, the recordings were admissible for the nonhearsay purpose of showing that Rodriguez's investigation was adequate. The trial court admitted the recordings over defendant's objections:

"I'm allowing it in—[defense counsel] raised the issue as to whether or not the length of the interviews [was] sufficient given the timeframe. And I'm going to allow it in so that the jurors can see what the interview consisted of so they can determine whether or not, under the circumstances, it was an appropriate investigation. That's the issue [the defense has] been raising: [W]as this an appropriate investigation? Did you talk to certain people? The interview wasn't long enough given the circumstances. Given that issue, the

content of the interview is significant as to whether it was an appropriately long interview. And so you can't criticize the length and then not allow the jury to see the content so they can determine whether or not it was an appropriately lengthy interview."

Before playing the videotapes for the jury, the court issued the following limiting instruction:

"[The tapes are] not being offered to prove the truth of what was being said. In other words, you should not view them from the standpoint of whether or not what is being said is true or not. But the issue has been raised as to whether or not the interviews were lengthy enough and were—whether or not the interviews were adequate. And so I'm going to—I'm admitting [the tapes] for the purpose of allowing you to see the content of those interviews so you can make that judgment as to whether or not the time and length of the interview was adequate. But you should not accept what is being said there as necessarily being true."

This appeal also concerns the testimony of a former Department of Human Services caseworker who had visited the family's home in 1998 to investigate a report of unsanitary living conditions. The former caseworker, Hansen, testified that she found the report to be unsubstantiated and that "[e]verything appeared fine" at the house. Defendant did not ask Hansen about sexual abuse. During cross-examination, the state asked whether Hansen had been sent to investigate sexual abuse and whether anyone reported sexual abuse during her visit. Hansen answered "no" to both questions. The state then asked, "[I]s it your experience that kids automatically just tell you if they're being sexually abused?" Defendant objected, and the court excused the jury.

Defendant argued that, to the extent that Hansen intended to testify generally about the behaviors of sexually abused children, such testimony is scientific evidence that Hansen was unqualified to offer. Defendant also argued that the state's questioning went beyond the scope of direct examination of Hansen. The state then attempted to lay a proper foundation for the introduction of scientific evidence. Hansen testified that she had worked for child protective services for a total of 13 years; that she had a bachelor's

degree in social work; and that she had received specialized training in "child sexual abuse, on neglect, on psychological damage, law enforcement issues on how to interview, those types of things." She stated that she had worked on 100 cases involving child sexual abuse and had testified as an expert witness "on the issue of child sexual abuse" more than 20 times. She also acknowledged, however, that she was not a licensed psychologist and that she was not "qualified to do psychological evaluations."

The court ruled that Hansen would be allowed to testify about her own experience with children who were victims of sexual abuse but would not be allowed to offer scientific evidence.[2] Hansen then testified:

> "[THE STATE]:   Now, over the course of your career, have you had an experience to interview a kid who would not disclose any form of abuse, but years later, the abuse was corroborated?
>
> "[HANSEN]:   Yes.
>
> "[THE STATE]:   How many times?
>
> "[HANSEN]:   More so than having them report abuse at the time—the first time of interview.
>
> "* * * * *
>
> "[THE STATE]:   And in your career, even when children disclosed abuse, did you ever see those same children displaying affection towards the person that abused them?
>
> "[HANSEN]:   Yes.
>
> "[THE STATE]:   How frequently did that occur?

---

[2] Specifically, the court ruled:

"THE COURT: * * * I'm going to allow the testimony as to what she has experienced, but I think when she starts—when you got to the point where she was testifying as to what victims of sex abuse do and why, I think that the—I don't think she's—I don't think you've laid the appropriate foundation for that. I'll allow her to testify as to what she's experienced in terms of interviewing children and non-disclosure, because that's basically—that's simply her experience.

"[THE STATE]: I'm assuming she can get into that her experience has been—kids who she's talked to who didn't disclose, but then later it was confirmed that they were being abused. . .

"THE COURT: Correct, but as to why children don't disclose, I think that gets into the scientific area."

"[HANSEN]: Most all the time.

"[THE STATE]: So the—based on your training and experience, they didn't show tremendous fear of the abuser?

"[HANSEN]: Not mostly. Children love their parents.

"[THE STATE]: Specific kids. Not general.

"[HANSEN]: Specific kids—general—the kids that I have interviewed *** still love their parents when they come in and report things. So there is a part of—a small percentage of those that are absolutely fearful. But for the most part, children still love their parents—the ones that I have interviewed."

During its closing argument, the state displayed a PowerPoint slide that asserted that "[a] 30-minute interview is more than enough" and reminded the jury that "[y]ou saw the interviews"; "[y]ou saw the demeanor of the girls"; and "Detective Rodriguez had more than enough." The prosecutor also told the jury,

"You saw what the officers did in their investigation, you heard the defense counsel claim that 30 minutes is not enough and that somehow Detective Rodriguez did a lousy investigation. You had an opportunity to see the investigation that was done in this case. You saw—had the opportunity to look at the demeanor that Detective Rodriguez relied on in submitting this case. You saw the STAR interview. You saw these kids on the stand."

Defendant objected and requested a mistrial, arguing, among other things, that the PowerPoint slide and the prosecutor's remarks amounted to impermissible comments on the credibility of S and K. The trial court denied the motion and declined to give a further limiting instruction.

The jury found defendant guilty of three counts of first-degree sodomy (Counts 1, 2, and 3), one count of second-degree sodomy (Count 4), five counts of first-degree sexual abuse (Counts 5, 6, 7, 8, and 9), and one count of second-degree rape (Count 10). At sentencing, the trial court merged Count 2 with Count 6, and Count 4 with Count 8, based on the state's concession that both crimes would necessarily be "included with the commission of the other." The court then found that the remaining counts were "separate criminal

episodes," which meant that the court could impose consecutive sentences and that the so-called "shift-to-I" rule, OAR 213-012-0020(2), did not apply. Defendant objected, arguing that Counts 9 and 10 and Counts 3 and 7 were also part of the same criminal episodes and that, therefore, the court was required to apply the shift-to-I rule with respect to those counts. Defendant also argued that he was entitled to have the jury make findings as to whether those counts were part of the same criminal episodes. The trial court disagreed and imposed a 569-month sentence.

## II. DISCUSSION

Defendant makes five assignments of error. The first and second assign error to the admission of the two videotaped STAR Center interviews. In the third assignment, defendant argues that trial court erred in denying his motion for a mistrial based on the state's closing and rebuttal arguments. The fourth assignment challenges the testimony that Hansen, the former DHS caseworker, gave on cross-examination. The fifth assignment concerns the trial court's decisions at sentencing.

A. *First and Second Assignments of Error: STAR Center Interviews*

Defendant's arguments on appeal differ in part from the arguments that he raised to the trial court. He now argues that it was error for the court to admit the videos because (1) the recorded interviews were outside the scope of defendant's cross-examination; (2) the STAR Center staff's comments constituted an impermissible comment on witness credibility; and (3) the admission of the videos violated defendant's rights to confront his accuser. In addition, defendant argues that the videos should have been redacted before being shown to the jury because some portions of them were irrelevant and other portions contained allegations that defendant committed other uncharged crimes and bad acts.[3]

---

[3] Defendant also argued to the trial court that the videos should be excluded because their probative value was outweighed by the danger of unfair prejudice. *See* OEC 403. Because defendant does not reprise that argument on appeal, we do not address it.

As an initial matter, we address the state's assertion that several of those arguments are not preserved. In order to preserve a claim of error, "a party must provide the trial court with an explanation of his or her objection that is specific enough to ensure that the court can identify its alleged error with enough clarity to permit it to consider and correct the error immediately, if correction is warranted." *State v. Wyatt*, 331 Or 335, 343, 15 P3d 22 (2000); ORAP 5.45(4). A pretrial evidentiary ruling typically preserves associated claims of error even if the issue is not relitigated during the trial itself. *State v. Cole*, 323 Or 30, 35, 912 P2d 907 (1996) ("Once an evidentiary ruling is made pretrial, the lack of later relitigation of the same issue, even where a statute permits relitigation on a discretionary basis, does not render any claim of error associated with the ruling unpreserved.").

First, we agree with the state that defendant did not preserve his argument regarding the right to confrontation. The record reflects that, apart from a fleeting and isolated reference to "defendant's rights to confrontation and due process under Amendments VI and XIV of the United States Constitution and Article I, section 11, of the Oregon Constitution" in defendant's motion to exclude the STAR Center videos, defendant never actually made an argument as to how the introduction of the videos denied him the right to confront his accusers. We will not address an argument that the trial court did have an opportunity to consider.

The state also argues that defendant failed to preserve his argument that statements in the videos were an "improper comment on the credibility of the victims." The state correctly points out that defendant did not raise this argument during the trial itself. Nevertheless, we conclude that defendant sufficiently preserved the issue for appeal. During the hearing on defendant's pretrial motion to exclude the video recordings, defendant argued that the portions of K's video in which STAR Center staff "describe[] all of the rules" were not admissible. Defendant specifically cited the phrase "[w]e always tell the truth in here" and argued that that staff person was "basically telling the jury 'You're going to tell the truth in here.'" Defendant then argued that that comment "violated [*State v. Southard*, 347 Or 127, 218 P3d 104 (2009),] and every vouching case that's ever existed."

The trial court rejected defendant's arguments, explaining, "I don't view the description of the rules as being vouching. [The staff person] didn't say anything about whether she believed [K] or not, she simply said, 'These are the rules. We want you [to] tell the truth, we want you to follow these rules.'" The lack of later relitigation did not render defendant's argument unpreserved. *Cole*, 323 Or at 35.

We now turn to defendant's arguments that are properly before us on appeal, beginning with the assertion that the trial court should not have admitted the STAR Center videotapes during the state's cross-examination of Rodriguez because they contained material that was beyond the scope of the direct examination. Under OEC 611(2), "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." Questions on cross-examination "should not be limited to the exact facts stated on direct examination, but [may] extend[] to other matters which tend to limit, explain, or qualify them, or to rebut or modify any inference resulting therefrom, provided they are directly connected with the matter stated in the direct examination." *Ritchie v. Pittman*, 144 Or 228, 231, 24 P2d 328 (1933). A trial court's ruling as to whether a line of questioning during cross-examination exceeds the scope of the direct examination is reviewed for errors of law. *State v. Wirfs*, 250 Or App 269, 274, 281 P3d 616, *rev den*, 352 Or 377 (2012).

We reject defendant's argument that the videotapes contained material that went beyond the scope of direct examination. Defendant pursued a theory at trial that the girls' mother had persuaded them to falsely accuse defendant in retaliation for defendant's extramarital affair some years earlier and that police failed to uncover that because they were negligent in investigating the girls' allegations. Consistently with that theory, defense counsel's direct examination of Rodriguez placed the adequacy of the investigation—and, specifically, the sufficiency of the STAR Center interviews—squarely at issue. The trial court correctly allowed the prosecution to respond by introducing the videotaped interviews so that the jury could assess the validity of defendant's contention that the interviews were inadequate.

With respect to defendant's second argument, it is well settled that a witness may not testify that, in his or her opinion, another witness is telling the truth. *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983); *see also State v. Milbrant*, 305 Or 621, 629, 756 P2d 620 (1988) ("The assessment of credibility is for the trier of fact * * *."). Nor may a witness offer testimony that, when viewed in the context of the trial proceedings, is "tantamount to stating that another witness is truthful." *State v. Viranond*, 346 Or 451, 458, 212 P3d 1252 (2009) (quotation marks omitted). Here, defendant argues that the portion of the STAR Center video in which a staff member tells K during the interview that "we always tell the truth" was a comment on K's credibility.

We disagree. At most, that comment expressed the interviewer's expectation that K answer her questions honestly; it did not imply that the interviewer actually believed that K had been honest during her interview. Indeed, the "we always tell the truth" comment was made before the interview with K had even begun in earnest. Thus, the jury would have understood that the staff member was not yet in the position to form, let alone express, an opinion about K's honesty.[4]

Defendant's final argument is that certain portions of the videos should have been redacted. We conclude that, even if it was error to admit the STAR Center videotapes without redacting irrelevant material or references to defendant's other bad acts, it was harmless error. An error is harmless if there is little likelihood that it affected the verdict. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Here, defendant first argues that the videos "contained irrelevant personal background information about [the victims'] likes and dislikes." As we understand it, that argument refers to portions of the videos in which the STAR Center staff began the interviews by briefly asking S and K about school, pets, and hobbies. At trial, defendant argued that that information was prejudicial because it would endear S and K to the

---

[4] The record also reflects that the staff member who conducted K's interview never testified at trial. As we explained in *State v. Brooks*, 247 Or App 676, 681 n 2, 270 P3d 388, *rev den*, 352 Or 265 (2012), "*Middleton* and its progeny only preclude comments about the credibility of a witness, whether that witness testifies or not, by *another witness at trial*." (Emphasis in original.)

jury. We conclude that there was little likelihood that the jury's verdict was affected by S and K's brief answers to the types of basic personal background questions that were asked in this case.

Defendant also argues that OEC 404(3) required that any references to "other crimes, acts, or wrongs" be redacted from the video. For the most part, the videotapes mirror the in-court testimony of S and K. It is true, however, that S briefly mentioned other bad acts committed by defendant; S said that defendant had blown crystal methamphetamine smoke into her mouth, and she briefly described an incident of sexual abuse that does not appear to have been charged. But S testified in person and without objection that defendant had touched her "in a sexual way" "[h]undreds of times" and "[p]retty much on a daily basis." Given that testimony, the passing references in the video to uncharged conduct were unlikely to have a significant impact on the jury. Finally, and most critically, the jury was specifically instructed not to accept the statements made on the video as substantive evidence. We presume that the jury followed those instructions. *State v. Thompson*, 328 Or 248, 271, 971 P2d 879, *cert den*, 527 US 1042 (1999); *see also State v. Hennagir*, 246 Or App 456, 266 P3d 128 (2011), *rev den*, 352 Or 33 (2012) (holding that a similar cautionary instruction rendered harmless any error in the court's failure to redact portions of a video).

B.  *Third Assignment of Error: Denial of Motion for a Mistrial*

Defendant moved for a mistrial, arguing (as relevant on appeal) that the prosecutor's rebuttal statement and Rodriguez's testimony were improper comments on the credibility of S and K. Defendant also requested that the court instruct the jury not to consider any assessment by Rodriguez of the girls' demeanor during the interviews. The trial court denied the motion for a mistrial and refused to give defendant's requested instruction. Defendant challenges both rulings in his third assignment of error.

We review a trial court's ruling denying a motion for mistrial for abuse of discretion. *State v. Arreola*, 250 Or App 496, 500, 281 P3d 634, *rev den*, 353 Or 103 (2012). Denial of

a mistrial motion will be deemed error only "when a defendant's ability to obtain a fair trial has been impaired." *State v. Vann*, 158 Or App 65, 72, 973 P2d 354 (1999).

There is no indication in the record that Rodriguez explicitly vouched for the credibility of either witness. The issue, therefore, is whether, in context, Rodriguez's statements were tantamount to testimony that those witnesses were credible. The context for Rodriguez's remarks includes the facts that the STAR Center videos were introduced in order to demonstrate that Rodriguez conducted "an appropriate investigation" and that the prosecutor referenced the "demeanor" of S and K while discussing the videos during his rebuttal argument.

Defendant argues that Rodriguez's testimony suggested that "he found the interviews so satisfactory that he concluded he could arrest defendant straight away, with no further investigation." Defendant then argues that, in light of the purpose for which the videotapes were admitted, the jury would necessarily be invited to conclude that Rodriguez believed that S and K were telling the truth. We disagree, however, with defendant's characterization of Rodriguez's remarks. Most of Rodriguez's testimony consisted of various explanations about why further interviews would not be productive. Although it is true that, at one point, Rodriguez testified that he was "satisfied with the [STAR Center] interviews that took place," that answer cannot be understood as a comment on the credibility of either S or K. Rather, that response came in answer to defendant's questions about the STAR Center staff's training. In other words, Rodriguez avoided directly commenting on the credibility of either victim.[5]

The state's reminder to the jury that it "had the opportunity to look at the demeanor that Detective Rodriguez relied on in submitting this case" presents a closer question.

---

[5] Defendant is correct that all of the evidence that he is challenging tends to show that S and K were telling the truth. That alone, however, does not make Rodriguez's remarks improper. *See Viranond*, 346 Or at 460 (holding that testimony does not amount to impermissible vouching simply because it tends to rehabilitate the credibility of other witnesses); *Middleton*, 294 Or at 435 (noting that many times the testimony of one witness will "tend to show that another witness either is or is not telling the truth").

We conclude, however, that the trial court was not required to grant a mistrial. First, the state's rebuttal argument came in response to defendant's argument that the police investigation was inadequate. The trial court properly gave the state latitude to respond by arguing that the STAR Center interviews were sufficient. *State v. Guritz*, 134 Or App 262, 270, 894 P2d 1235, *rev den*, 321 Or 560 (1995) (stating that "[t]he prosecutor has the right * * * to reply to argument made by opposing counsel, and, in doing so, statements may be made which otherwise would be improper"). Furthermore, although the trial court did not give a curative instruction after the prosecutor made those remarks, the court had already instructed the jury not to view the videos "from the standpoint of whether or not what is being said is true or not" but rather "whether or not the time and length of the interview was adequate." Under those circumstances, defendant's ability to receive a fair trial was not impaired.

C.  *Fourth Assignment of Error: Hansen's Testimony*

In his fourth assignment of error, defendant argues that the trial court erred in (1) allowing testimony from Hansen that exceeded the scope of direct examination, and (2) having concluded that Hansen was not a qualified "expert witness," nonetheless allowing Hansen to testify "as if she were an expert." We review the trial court's evidentiary rulings for errors of law. *State v. Sanchez-Alfonso*, 352 Or 790, 797, 293 P3d 1011 (2012).

First, we conclude that Hansen's testimony on cross-examination was not beyond the scope of direct examination just because the prosecution asked questions about sexual abuse. We agree with the state that the purpose and relevance of defendant's direct examination of Hansen was to support an inference that, because things appeared to be "fine" during her visit, it was less likely that defendant was abusing S or K at or around that time. Because the inference that defendant was asking the jury to draw was directly connected to Hansen's testimony about her observations, the prosecution was entitled to refute that inference on cross-examination, "even to the extent of inquiring into a different set of facts than those that were elicited on direct." *State v. Stevens*, 328 Or 116, 133, 970 P2d 215 (1998).

With respect to defendant's second argument, defendant incorrectly characterizes the trial court's ruling as being that "Hansen was not qualified to testify as an expert witness." The record indicates that Hansen had relevant training and experience in the field of child-abuse investigations and that the court properly allowed her to testify as an expert on those issues. Because Hansen did not have specialized training in the field of child psychology, the court ruled that she was not qualified to offer *scientific* evidence about the behavior of child sexual abuse victims. Although the line between those two types of expert testimony "may be fine, it is not artificial." *State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013). The distinction is that "[s]pecialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science." *Id*. By contrast, scientific evidence is that which "draws its convincing force from some principle of science, mathematics and the like." *State v. Brown*, 297 Or 404, 407, 687 P2d 751 (1984). Whether testimony is scientific "depends primarily on 'whether the trier of fact will perceive the evidence as such.'" *State v. Whitmore*, 257 Or App 664, 670, 307 P3d 552 (2013) (quoting *State v. Marrington*, 335 Or 555, 561, 73 P3d 911 (2003)). "[T]he key question in determining whether proffered testimony is 'scientific,' and thus requires a special foundation, is 'whether the expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions.'" *Rambo*, 250 Or App at 193 (quoting *Marrington*, 335 Or at 561-63).

We agree with the state and the trial court that Hansen's testimony on cross-examination was not impermissible *scientific* evidence. The issue here is similar to what we confronted in *State v. Clemens*, 208 Or App 632, 145 P3d 294 (2006), *rev den*, 342 Or 299 (2007). *Clemens* involved the testimony of the investigating officer, Robles, who "had relevant training and experience in the area of child sexual abuse investigations, but not * * * any relevant or specialized education or knowledge in the field of psychology and child behavior." *Id*. at 638-39. During trial, Robles testified that "the victim's statement was generally consistent with the nonchronological reporting patterns of child abuse victims."

*Id.* at 635. We concluded that Robles's statement was not scientific evidence:

> "The disputed portion of his testimony * * * did not 'involve the vocabulary of scientific research.' Nothing in Robles's testimony suggested to the court that his opinions were 'grounded on conclusions that have been reached through application of a scientific method to collected data.' Further, by its comments the court made clear that it was aware of the difference between testimony based on personal experience, such as that provided by Robles, and testimony that is scientific in nature. Based on the record as a whole, then, we conclude that Robles's disputed statement retained no 'increased potential' to influence the trier of fact as a scientific assertion."

*Id.* at 639 (quoting *Marrington*, 335 Or at 563).

The same reasoning applies here. The trial record reflects that the prosecutor's questions and Hansen's answers were explicitly framed in terms of her own career, training, and experience. Hansen did not refer to studies, research, scholarly literature, or anything else that would cause a jury to infer that her testimony was based on more than her personal experience, as in the cases that defendant cites on appeal. *See, e.g., State v. Perry,* 347 Or 110, 218 P3d 95 (2009). Hansen's testimony thus did not draw its convincing force from some principle of science. *See also Rambo,* 250 Or App at 195 (holding that trial court did not err in admitting testimony that drew its force from training and experience rather than "the mantle of science"). The trial court did not err by admitting her testimony.

D. *Fifth Assignment of Error: Sentencing*

At sentencing, the trial court determined that all of defendant's felony convictions, except for the merged Counts 2 and 6, and Counts 4 and 8, were separate criminal episodes. Three consequences flowed from that determination. First, the court could impose consecutive sentences. *See* ORS 137.123 (allowing a court to impose consecutive sentences when a defendant is "simultaneously sentenced for criminal offenses that do not arise from the same continuous and uninterrupted course of conduct"). Second, each time the trial court passed sentence on a count representing a separate criminal episode, the court considered that count

to be part of defendant's criminal history for the purpose of the remaining counts. *See State v. Bucholz*, 317 Or 309, 314, 855 P2d 1100 (1993) ("Nothing in the wording of the criminal history rule excludes consideration of the conviction for a separately occurring crime merely because the two separate crimes are sentenced on the same day and in the same session of court."). Third, the so-called "shift-to-I" rule did not apply.[6] *Orchard v. Mills*, 247 Or App 355, 358, 270 P3d 309 (2011), *rev den*, 352 Or 33 (2012) ("[T]he 'shift-to-I' rule applies only when consecutive sentences are imposed for crimes that arise from a single criminal episode.").

Crimes arise from different criminal episodes when they are not part of the same "continuous and uninterrupted conduct that * * * is so joined in time, place and circumstances that such conduct is directed to the accomplishment of a single criminal objective." ORS 131.505(4). On appeal, defendant does not challenge the trial court's decision to impose consecutive sentences. He concedes, in other words, that the court was permitted to make the factual determination that his crimes were separate criminal episodes and then to impose consecutive sentences based on that fact. Defendant argues, however, that that same factual finding cannot be used as a basis to increase his criminal history score and to avoid the shift-to-I rule.

Defendant's argument is based on *Apprendi v. New Jersey*, 530 US 466, 120 S Ct 2348, 147 L Ed 2d 435 (2000), and *Blakely v. Washington*, 542 US 296, 124 S Ct 2531, 159 L Ed 2d 403 (2004). Those cases stand for the proposition that the Sixth Amendment to the United States Constitution

---

[6] The "shift-to-I" rule refers to Oregon's 99-block Sentencing Guidelines Grid. A trial judge uses those guidelines in the following manner:

"A sentencing judge uses the grid to determine the proper sentence for a given conviction by, first, identifying the appropriate category for the crime of conviction on the vertical crime seriousness scale; then, determining the appropriate category for the convicted offender on the horizontal criminal history scale; and, finally, locating the grid block where the two categories intersect.

"The criminal history scale classifies an offender's history according to the number and nature of the offender's prior convictions. OAR 213-004-0006(1). The scale consists of nine categories, ranging from 'A' (the highest) to 'I' (no criminal history)."

*State v. Burns*, 259 Or App 410, 414, 314 P3d 288 (2013) (citations omitted).

requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 US at 490. That rule is easily applied when, for example, a conviction entered years earlier, during a different proceeding, operates to increase the penalty for a subsequent conviction. Under such circumstances, the "prior conviction" exception would apply and the trial court would be permitted to determine the defendant's criminal history. *Apprendi*, however, did not address whether, in the course of determining that a prior conviction exists, a trial court is also permitted to determine certain predicate facts, such as whether multiple convictions arose out of separate criminal episodes.

That is precisely the issue we addressed in *State v. Mallory*, 213 Or App 392, 162 P3d 297 (2007), *rev den*, 344 Or 109 (2008). In that case, we cited with approval *U.S. v. Harris*, 447 F3d 1300, 1304 (10th Cir 2006), in which the Tenth Circuit observed that

> "[t]he time, place, and substance of the prior convictions can ordinarily be ascertained from court records associated with those convictions, and the Supreme Court has held that the Constitution allows sentencing courts to rely on such records to make findings about prior convictions."

We noted, however, that a "separate criminal episode" determination *cannot* always be made simply by referring to the court's records. That is so because

> "a factfinder in a criminal case does not necessarily have the opportunity or responsibility to determine the scope of the criminal episode or episodes involved in the case. Stated differently, a factfinder in a criminal case often makes no finding of fact that conclusively determines the temporal, locational, and circumstantial scope of the episode at issue, because the determination of those matters is not necessary to adjudicate the defendant's guilt of a particular offense. Thus, for example, a factfinder's verdict that a defendant committed theft of property belonging to a particular victim on a particular date does not necessarily conclusively determine whether a separate conviction for a different theft from the same victim on the same date arose from the same criminal episode. To make that determination, it is

necessary to consider the relationship of the crimes in time, place, and circumstance."

*Mallory*, 213 Or App at 402. Thus, in *Mallory*, we concluded that "[t]he conclusion of 'separateness' * * * does not implicate the requirements of *Apprendi* and *Blakely*, unless it requires *factfinding beyond a determination of what is in the court records." Id.* at 405 (emphasis added).

After our decision in *Mallory*, the United States Supreme Court issued its opinion in *Oregon v. Ice*, 555 US 160, 129 S Ct 711, 172 L Ed 2d 517 (2009), which held that *Apprendi* does not apply to "[t]he decision to impose sentences consecutively." 555 US at 168. In that case, the Supreme Court construed *Apprendi* and *Blakely* as applying to any finding of fact that "increases the maximum punishment authorized *for a particular offense." Id.* at 163 (emphasis added). The Court declined to extend the rule to the finding of "any fact declared necessary to the imposition of consecutive, in lieu of concurrent, sentences." *Id.*

As noted above, defendant does not argue that *Apprendi* and *Blakely* precluded the trial court from imposing consecutive sentences on the basis of the court's finding of separate criminal episodes. Such an argument would have been foreclosed by *Ice.* Defendant argues, rather, that the finding of separate criminal episodes by the trial court could not be used to enhance the penalties for particular crimes through the court's calculation of defendant's criminal history score and the avoidance of the shift-to-I rule.

We agree with defendant in part. As mentioned above, the jury convicted defendant of 10 counts; the trial court determined that the 10 counts comprised a total of eight separate criminal episodes. The jury was not asked to determine the precise dates of those episodes. The jury was, however, instructed that, in order to find defendant guilty for a particular count, it had to find that the crime occurred while the family was living at a particular address. Therefore, the jury found that three crimes (Count 1, Count 3, and Count 7) occurred when the family was living in a home on 2nd Avenue in Ontario; that three crimes (Count 5, Count 9, and Count 10) occurred when the family was living in a home on 1st Avenue in Ontario; and that

the remaining crimes occurred after the family moved to Nyssa (including Count 2 and Count 4).[7] In other words, the "court records" reflect that defendant's crimes were committed during three distinct periods of time, at three different locations. Under *Mallory*, the trial court was permitted to rely on those records to find that crimes occurring during different time periods and at different locations were part of separate criminal episodes.

We reach a different conclusion, however, for the crimes that occurred within the same time period and at the same location. As to those crimes, the only way that the trial court could have concluded that they arose from separate criminal episodes was to conduct additional "factfinding beyond a determination of what is in the court records." *Mallory* teaches that that was error under *Apprendi* and *Blakely*.

We also conclude, however, that that error was harmless. A federal constitutional error does not require reversal "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *State v. Cook*, 340 Or 530, 544, 135 P3d 260 (2006). Applying that standard, we have found a similar sentencing error to be harmless where "the testimony of the victim * * * clearly established that each of the offenses was a separate incident; that is, they each occurred at different times and at different locations over a period of years." *State v. Bowen*, 220 Or App 380, 383, 185 P3d 1129, *rev den*, 345 Or 415 (2008) (quotation marks omitted). The same is true here.

There was no testimony that defendant abused S and K together at or near the same time. Thus, one could reasonably conclude that all of defendant's crimes against S were separate episodes from his crimes against K. That leaves only two pairs of crimes that occurred at the same location involving the same victim: Counts 3 and 7 (involving S, at the 2nd Avenue house) and Counts 9 and 10 (involving S, at the 1st Avenue house).

The uncontradicted testimony at trial establishes that Counts 3 and 7, and Counts 9 and 10, were all separate

---

[7] Again, Counts 6 and 8 were merged into other crimes and, therefore, we do not consider them for the purposes of our sentencing analysis.

criminal episodes. S testified that, with respect to the charges in Count 7, defendant abused her when she was "[a] kindergartner." With respect to Count 3, she described an act of first-degree sodomy that occurred when she was in first grade. S testified that the conduct in Count 9—sexual abuse that occurred while S was playing on a bunk bed ladder in her sister's room—happened "right when we moved" to the house on 1st Avenue when she was nine years old. By contrast, in describing the conduct constituting Count 10, S testified that defendant raped her in her "mom's room" after he sent her sisters outside to play. That incident occurred when she was nine or 10. None of that testimony was contradicted at trial. Accordingly, we can "confidently say * * * beyond a reasonable doubt" that the conduct at issue was not "joined in time, place and circumstances" and was directed towards the accomplishment of different criminal objectives. Consequently, any sentencing error based on the court's findings of separate criminal episodes was harmless.

## III.   CONCLUSION

In summary, we conclude that the trial court did not err in admitting the STAR Center videotapes. The videotapes did not contain material that was beyond the scope of defendant's direct examination or that constituted a comment on witness credibility. Furthermore, any failure to redact portions of the videos was harmless. We conclude that neither the prosecutor's rebuttal statement nor Detective Rodriguez's testimony contained improper comments on the credibility of a witness. We conclude that Hansen's testimony was not beyond the scope of defendant's direct examination and that she did not offer scientific evidence during the state's cross-examination. Her testimony was based on her training and experience. Finally, we conclude that the trial court did err when it calculated defendant's criminal history score and declined to apply the shift-to-I rule based on the court's own finding of separate criminal episodes. That error, however, was harmless because the uncontroverted testimony at trial established that the criminal episodes were separate.

Affirmed.