Submitted February 25, 2014, convictions on Counts 2, 3, 7, and 10 reversed and remanded; remanded for resentencing; otherwise affirmed March 4, 2015

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES ANTHONY HAZLETT,
*Defendant-Appellant.*

Lane County Circuit Court
201122376; A151569

345 P3d 482

Peter Gartlan, Chief Defender, and Eric Johansen, Senior Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and David B. Thompson, Senior Assistant Attorney General, filed the brief for respondent.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and De Muniz, Senior Judge.

NAKAMOTO, J.

### NAKAMOTO, J.

In this criminal case, defendant appeals a judgment convicting him of first-degree unlawful sexual penetration, ORS 163.411 (Count 2); first-degree sexual abuse, ORS 163.427 (Count 3); fourth-degree assault constituting domestic violence, ORS 163.160 (Count 6); strangulation constituting domestic violence, ORS 163.187 (Count 7); and harassment, ORS 166.065 (Count 10). On appeal, defendant argues that the trial court erred in (1) ruling that defendant's expert witness was not qualified to testify about the effect of drug-induced dementia on a person's ability to form intent, (2) ruling that defendant had voluntarily waived his right to be present at trial when he was hospitalized mid-trial following a suicide attempt, and (3) denying defendant's motion for a continuance in light of his hospitalization. As explained below, we conclude that defendant's expert was qualified to testify about the effect of drug-induced dementia on a person's ability to form intent and that, therefore, the trial court erred in excluding that testimony. We further conclude that the error was not harmless as to the counts alleging that defendant acted knowingly or intentionally. Accordingly, we reverse and remand on Counts 2, 3, 7, and 10; affirm defendant's conviction on Count 6; and remand for resentencing.[1]

The crimes in this case involved defendant's assault and sexual abuse of W, a woman with whom he had had an intimate relationship. Defendant had been staying with W at her house one weekend. At some point, defendant hit W, took her to the bedroom, and forcibly touched and penetrated her vagina with his fingers. During the incident, defendant placed his arm on W's throat, making it difficult for her to breathe. Following the incident, one of W's friends, Garcia, telephoned W, and she answered the phone, crying. W told Garcia that she wanted defendant out of her house. Garcia called W's father, but could not reach him and left a message. Garcia then decided to go to W's house and brought another man, Martin, to help him.

---

[1] We reject defendant's second and third assignments of error without discussion. *See State v. Harris*, 291 Or 179, 630 P2d 332 (1981).

When Garcia and Martin arrived at the house, Garcia told defendant that W wanted him to leave and told defendant to get his things and go. Defendant began to gather his belongings but then went into one of the bedrooms. Garcia and Martin followed defendant and found him sitting on the bed holding two large knives. Garcia pulled out his handgun and told defendant to put the knives down or he would shoot him. Defendant put the knives down and went to the kitchen; Garcia told him again that he needed to get his things and leave. Defendant then grabbed a telephone and ran outside the house. Defendant dialed 9-1-1 and began urinating on W's car. W's father had arrived and tried to prevent defendant from going back inside the house and defendant shoved him into a wall. Eventually, police officers arrived and placed defendant under arrest.

The officers testified that defendant was visibly intoxicated, that he had "watery eyes, droopy eyelids, was very lethargic, slow with his motions," and that he "[c]ouldn't really stand on his feet by himself and had difficulty tracking questions and conversation." The officers attempted to get an explanation from defendant about what had happened. One of the officers testified that defendant had told him that he and W "were just partying. And she likes the rough stuff. She got what she asked for." The officer tried to get more information about what defendant meant by that, but defendant passed out in the patrol car. Defendant was charged with first-degree burglary (Count 1); two counts of first-degree unlawful sexual penetration (Counts 2 and 4); two counts of first-degree sexual abuse (Counts 3 and 5); fourth-degree assault constituting domestic violence (Count 6); strangulation constituting domestic violence (Count 7); unlawful use of a weapon (Counts 8 and 9); and harassment (Count 10).

At trial, defendant testified that he and W had had consensual sex the night before the incident and that the next day he had taken a number of drugs, including what he thought to be liquid morphine, Oxycodone, and Xanax. Defendant testified that the drugs had caused him to pass out and that he had no memory of the incident, only partial memory of Garcia being at the house, and no memory of the police or his arrest.

Following defendant's testimony, defense counsel intended to call as an expert witness Dr. Robert Julien, a retired anesthesiologist, to testify about the drugs that defendant had testified he took and their effects. At the state's request, the court held an OEC 104[2] hearing to determine Julien's qualification as an expert. Julien testified that he held advanced degrees in pharmacology, which is the science of how drugs affect living organisms. Julien also stated that his area of research in that field was psychopharmacology, which he described as the study of how drugs affect the brain and behavior, and that he had been the director of a psychopharmacology research laboratory at the University of California, Irvine. Julien testified that he had left that research in the early 1980s to practice medicine as an anesthesiologist. He also stated that he had testified in court as an expert in toxicology pharmacology around 60 times.

Defense counsel asked Julien, hypothetically, what symptoms a person weighing approximately 150 pounds would show if the person took "a dose of liquid morphine together with two or more Oxycodones, and one standard prescription Xanax, possibly in connection with some amount of ethyl alcohol." Julien testified that he would expect the person to appear sedated, with slurred and garbled speech, glassy eyes, droopy eyelids, confusion, and trouble standing up. He also said that blackout would be among the symptoms that he would expect. Julien then explained that a blackout is a loss of memory and is "essentially a drug-induced dementia, very similar to what you would see in somebody who had organic dementia with a disease such as Alzheimer's."

Julien stated that he had authored an article entitled, *"To Intend or Not to Intend. That is the Question,"* to explain the difference between a person who is unconscious and a person who is in a state of drug-induced dementia. The difference, Julien explained, was that a person experiencing a drug-induced dementia, like a person with Alzheimer's, appears awake and normal, but does not have the ability to form new memories. That inability to form memories, Julien explained, was "an index of brain function and of

---

[2] Under OEC 104(1), the court decides "[p]reliminary questions concerning the qualification of a person to be a witness[.]"

dysfunction of your executive cortex where we make judgments, decisions, intellect, IQ, all that kind of thing." Julien explained that he had induced dementia in his anesthesia patients in his medical practice and that, in his opinion, a person's inability to form memory as the result of dementia, either drug-induced or organic, affects the person's ability to form intent. Specifically, he said:

"If someone is demented, either organically or drug-caused, it is my contention, from many years of intentionally doing this to patients, that they cannot meet the legal definition of intent. For example, if you've had a Benzodiazepine for your colonoscopy and you don't remember your colonoscopy.

"If you signed a contract during that time, that would be an invalid contract because you were drug demented as indexed by the fact that you couldn't form memory."

Defense counsel asked Julien if it was his opinion that the combination of the drugs described in the hypothetical "would induce such a state?" Julien replied that it would.

On cross-examination, the state asked Julien whether in the article he was opining about criminal liability of a person during a blackout. Julien replied that he raised that question in his article:

"[PROSECUTOR]: All right. And in this article you kind of espouse on whether a person can be held criminally liable for their conduct during a blackout state, and also whether a victim or somebody who's claiming to be a victim could be responsible for their conduct even though they're in a blackout state. Correct?

"[JULIEN:] I said they could be awake—

"Q. Okay.

"A. —and functioning, and yet not remember it.

"Q. Right. But this article you're talking about, this is something that you're basically—you're opining about. Correct?

"A. It's a statement I wrote based on my 30-some years of pharmacology, textbook writing, anesthesia where—in anesthesia, for example, I have placed probably 20- or 25,000 people in this state.

"Q. I understand that. But you're, in this article, talking about legal liability or lack thereof. Not—

"A. I raise the question, yes.

"Q. Okay.

"A. I did not say that [in] there, but I raise the question."

At the conclusion of the OEC 104 hearing, the state argued that, although it believed that Julien was qualified as an expert to testify about what symptoms could be expected from taking the drugs at issue in this case, it did not believe that he was qualified to testify about intent:

"[PROSECUTOR]: All right. It's my understanding from the questions that were asked that [defense] counsel intends to go into a couple of different areas. One, what these particular intoxicants can do, and it certainly seems to me that Mr. Julien is qualified to talk about that.

"THE COURT: The symptoms.

"[PROSECUTOR]: The symptoms. That's right. I would argue that he's not allowed to get into any kind of extrapolation about intent or knowing and how that may apply to a criminal case because that is not something that's under his expertise. And he's also not a psychologist and not a psychiatrist and hasn't interviewed the defendant in that capacity.

"And some of those questions that [defense] counsel was asking are certainly going directly to that topic. And I would move that those are not admissible.

"I would also say that * * * the witness could not—I think he can say—ask questions of the behavior—behavior that you hear—the testimony about the behavior that you heard from the stand, is that consistent or not consistent with the—the symptoms of the drugs that you're hearing—you're describing. But I don't think that he can get into anything that talks about mental states of the defendant when he committed these crimes or anything to that effect."

Defense counsel responded that he believed that Julien, as an expert toxicologist and pharmacologist, was qualified to testify about intent. The court questioned defense counsel about the proper scope of Julien's testimony given his qualifications, and the following colloquy occurred:

"THE COURT: He's objecting to his qualifications to render an opinion about criminal liability.

"[DEFENSE COUNSEL]: All right. *** I will strike that from my line of questioning then. But I would ask him about the ability to form an intent.

"And what I did was give him *** a definition of intent which coincided with the legal definition of intent, could he comment about that without stating *** an opinion on ultimate legal liability?

"THE COURT: Well, I didn't hear that questioning.

"[DEFENSE COUNSEL]: Okay.

"THE COURT: So—

"[PROSECUTOR]: I didn't hear that question either, although I heard questions heading down that road.

"[DEFENSE COUNSEL]: Well, all right. I could change my line of questioning if you didn't want an opinion on legal liability. Criminal specifically.

"* * * * *

"[PROSECUTOR]: I did not hear *** anything that qualified *** Dr. Julien *** to testify regarding mental states regarding legal definitions. And I would argue it's not appropriate for [him] to testify regarding those types of things. He's a pharmacologist. And he gets to testify about drugs and their effects.

"THE COURT: And I would tend to agree with that. I think that *** when you're talking about drugs and their effects that it's different during your argument to argue about your client's intent given the symptoms and the testimony that you get from your expert.

"But *I don't know that a pharmacologist, at least from the testimony that I have here, is qualified as an expert on the forming of intent as defined in criminal statutes.* I think you're—I think you're going to get to argue about that—

"* * * * *

"[DEFENSE COUNSEL]: What I'm hearing is the Court does not want us to explore the issue of criminal

liability \* \* \* during my questioning of Dr. Julien and I believe we can do it that way.

"THE COURT: Right. I think that you can ask him about the drugs, what they are, what they do, what symptoms they produce, whether or not what he heard from your client was consistent with those uses and those symptoms. I think that he can talk about all of those things. I just don't think he can go down the 'intent' road.

"[DEFENSE COUNSEL]: Okay. But intent, as defined psychologically as opposed to legally, I can ask about that.

"THE COURT: Why? And *he just said he isn't a psychologist.*

"[DEFENSE COUNSEL]: All right. Fair enough."

(Emphasis added.)

After the court's ruling, the jury was brought back into the courtroom, and Julien was allowed to testify about the drugs that defendant had testified to taking, as well as the effects of those drugs, including that he would expect a person who had taken those drugs in combination to experience some blackout, or some difficulty in forming memory. Julien testified about what happens when a person blacks out: specifically, that a person experiencing blackout, or drug-induced dementia, can look and act normal but cannot remember what happened during the blackout period. Julien stated that people in that state "tend to think they're unconscious when they're just amnestic, and they're really not." Julien further testified that the description of defendant's behavior on the night of the incident was consistent with dementia, and that, with the exception of the sexual aggression that W had reported, defendant's behavior was consistent with the effects of the drugs he testified to taking. Julien was not allowed to testify about his article or his opinion regarding dementia's effect on a person's ability to form intent.

In closing arguments, both the state and defense counsel addressed the issue of whether defendant, if in a blackout state, could act with intent. The state, citing Julien's testimony, argued:

"You know a person's intent by their conduct. You know I intended to pick that pen up. Right? How do you know that? I picked the pen up. Right?

"Blackout does not mean lack of knowledge or lack of intent. Dr. Julien even says—the defense witness, the person they put on the stand—he says and agrees when I asked him: Memory is a process totally separate from behavior or state of alertness. Right? But I asked him and he said yes. Memory and intent and knowledge aren't tied together. That is not some exclusive connected link there.

"There's no jury instruction about anything as far as the alcohol: If this, then that. There is no legal direction you're given from the Court in a if he's intoxicated, he's not guilty. Or if he doesn't remember, he's not guilty. There is no statement. That is not the law: You evaluate whether he knew what he was doing at the time that he did it, not whether he regrets later or not whether he doesn't remember it later. It's did he know what he was doing at the time that he did it. * * *"

In defendant's closing, defense counsel argued that defendant's state of intoxication called into question his ability to act intentionally.

The jury found defendant guilty of Count 2 (first-degree unlawful sexual penetration), Count 3 (first-degree sexual abuse), Count 6 (fourth-degree assault constituting domestic violence), Count 7 (strangulation constituting domestic violence), and Count 10 (harassment). The jury found defendant not guilty of Count 4 (first-degree unlawful sexual penetration), Count 5 (first-degree sexual abuse), and Count 8 (unlawful use of a weapon). The court dismissed Counts 1 and 9, burglary and unlawful use of a weapon, on the state's motion.

On appeal, defendant argues that the trial court erred in ruling that Julien was not qualified to testify about the effect of organic and drug-induced dementia on a person's ability to form intent. Specifically, defendant argues that the trial court prohibited Julien from testifying about his article, including the fact that, in the article, Julien raised the question of legal liability in cases of dementia and discussed whether a person could be held criminally liable for their conduct during a blackout state. Defendant also argues

that Julien was prohibited from testifying that, if a person was demented, either organically or drug-induced, the person could not meet the legal definition of intent, and that, based on his opinion, the combination of drugs and alcohol involved in this case would induce such a state. Defendant contends that Julien's special knowledge, skills, experience, training, and education, namely his background in fields that specifically relate to the effects of drugs on the body and mind, as well as his medical practice in anesthesiology and the fact that he had published an article addressing that precise topic, all qualified him to testify about the effect of organic and drug-induced dementia on a person's ability to form intent.

In response, the state does not attempt to explain why the trial court's ruling was correct. It instead argues that defendant failed to preserve his argument below. Specifically, the state contends that (1) defendant failed to establish at trial that Julien had any opinion about a demented person's ability to form criminal intent, and (2) defendant failed to make an offer of proof regarding what Julien had to say about the effect of dementia on a person's ability to form a criminal mental state. For the reasons that follow, we conclude that defendant sufficiently preserved the issue he raises on appeal, namely whether Julien was qualified to testify as an expert regarding the effect of dementia on a person's ability to form intent.

In a case in which a court has excluded evidence, the error is preserved if "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." OEC 103(1)(b). An offer of proof to preserve error regarding the exclusion of testimony can be made either by question and answer or through counsel's statement of what the proposed evidence is expected to be. *State v. Morgan*, 251 Or App 99, 105, 284 P3d 496 (2012). "We review the state's assertion that defendant's offer of proof was insufficient to preserve an issue advanced on appeal by considering whether the purposes that underlie the requirement were fulfilled by defendant's offer." *Id.* at 104-05. "One purpose of an offer of proof is to assure that the trial court can make an informed decision. An offer of proof permits the parties to raise additional arguments, if

appropriate, and gives the court an opportunity to reconsider its ruling and correct any error." *Schacher v. Dunne*, 109 Or App 607, 610, 820 P2d 865 (1991), *rev den*, 313 Or 74 (1992) (internal quotation marks omitted).

We conclude that that purpose was satisfied in this case. Defense counsel's examination of Julien in the OEC 104 hearing and the arguments presented to the court in the colloquy following that examination adequately informed the court of the substance of the proposed evidence and its alleged error in excluding it. Contrary to the state's contention, Julien's testimony, as well as defense counsel's arguments, established that Julien had an opinion about the effect of dementia on a person's ability to form intent and what that opinion would be. For example, at the OEC 104 hearing, Julien testified:

> "If someone is demented, either organically or drug-caused, it is my contention, from many years of intentionally doing this to patients, that they cannot meet the legal definition of intent. For example, if you've had a Benzodiazepine for your colonoscopy and you don't remember your colonoscopy.

> "If you signed a contract during that time, that would be an invalid contract because you were drug demented as indexed by the fact that you couldn't form memory."

Furthermore, the colloquy between the court and the parties established that everyone involved understood what testimony defense counsel sought from Julien. Defense counsel, in his arguments to the court, indicated his belief that Julien was qualified to testify about the ability of a person to form intent while under the influence of the drugs that defendant testified to taking. The prosecutor argued that Julien should not be allowed to "get into any kind of extrapolation about intent or knowing and how that may apply to a criminal case because that is not something that's under his expertise." The prosecutor also, at another point in the colloquy, argued that he "did not hear anything that qualified *** Dr. Julien *** to testify regarding mental states regarding legal definitions." The trial court also indicated its understanding of defendant's argument regarding Julien's proposed testimony when it stated, "I don't know

that a pharmacologist, at least from the testimony that I have here, is qualified as an expert on the forming of intent as defined in criminal statutes" and, "I just don't think he can go down the 'intent' road." On the whole, the record demonstrates that the court understood the substance of the evidence that defendant sought to introduce through Julien's testimony. Accordingly, we conclude that defendant sufficiently preserved his assignment of error.

Moving to the merits of that argument, as described above, defendant contends that Julien was qualified under OEC 702 to render an expert opinion about the effect of dementia on a person's ability to form intent. We review a trial court's determination of whether a witness is qualified under OEC 702 to provide expert testimony about a particular topic for legal error, without deference to the trial court. *State v. Rogers*, 330 Or 282, 315, 4 P3d 1261 (2000); *State v. Dunning*, 245 Or App 582, 589-90, 263 P3d 372 (2011). For the reasons that follow, we conclude that the trial court erred in concluding that Julien was not qualified as an expert to testify regarding the effect of dementia on a person's ability to form intent.

Under OEC 702,

"[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

The proper application of OEC 702 requires an assessment of the particular qualifications of the witness. *Rogers*, 330 Or at 316. A witness is not assumed to be disqualified merely because the person lacks a particular educational or professional degree. *Id.*; *see also Barrett v. Coast Range Plywood*, 294 Or 641, 649, 661 P2d 926 (1983) (holding that it was error to exclude the testimony of medical doctors about a diagnosis of functional overlay, which is a psychological component of an injury, on the ground that the witnesses were not psychologists or psychiatrists); *Sandow v. Weyerhaeuser Co.*, 252 Or 377, 383-84, 449 P2d 426 (1969) (holding that the trial court erred in excluding the testimony of a clinical psychologist that the plaintiff's head injury had caused

his emotional disturbance; observing that a properly qualified psychologist is competent to testify about a person's mental and emotional condition despite not having medical training).

In this case, it appears that the trial court's ruling was based on the fact that Julien was not a psychologist, but a pharmacologist, and that a pharmacologist, at least based on the testimony before the court, was not "qualified as an expert on the forming of intent as defined in criminal statutes." However, the record demonstrates that Julien had education, experience, and knowledge that qualified him to testify about the effect of drug-induced dementia, or blackout, on a person's ability to form intent. Julien had advanced degrees in pharmacology, and his area of research had been in psychopharmacology, which, as Julien explained, is the study of how drugs affect the brain and behavior. He also had years of experience as an anesthesiologist, during which he had placed, in his estimation, 20,000 to 25,000 patients in a state of drug-induced dementia, allowing him to observe how people act during that state and what they remember afterward. Based on that education and experience, Julien published an article addressing drug-induced dementia, its effect on memory function, and how, in his opinion, drug-induced dementia prevents a person from acting in a manner that meets the legal definition of intent. Despite the fact that Julien was not a psychologist or psychiatrist, his education, experience, and knowledge qualified him to testify as an expert regarding the effect of drug-induced dementia on a person's ability to form intent. Accordingly, the trial court erred in excluding Julien's testimony.

Evidentiary error is not presumed to be prejudicial, OEC 103(1), and we will affirm despite an evidentiary error if there is "little likelihood that the particular error affected the verdict[.]" *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). One consideration in making a harmless error determination is what "role *** the erroneously excluded evidence played in the proponent's theory of the case." *State v. Hren*, 237 Or App 605, 609, 241 P3d 1168 (2010). In this case, defendant's theory was that, on the day of the incident, he had taken a combination of drugs that had caused

him to blackout and to be unable to remember the incident. Defense counsel argued that, as a result, he was not able to form the intent required for the crimes. Other witnesses' testimony corroborated that defendant was intoxicated when he was arrested. Although Julien was able to testify before the jury about the expected effects of the drugs that defendant testified he had taken and that Julien would expect someone who had taken that combination of drugs to experience blackout and an inability to form memories, he was not allowed to testify about his opinion that dementia, or blackout, affects a person's ability to form intent. We conclude that, as to the counts requiring the state to prove that defendant acted either knowingly or intentionally, the trial court's error in excluding Julien's testimony was not harmless. The defense theory was, in large part, that defendant's intoxication and blackout state rendered him unable to form those mental states. However, as to Count 6, in which the state alleged that defendant had acted recklessly, the fact that defendant's substance use made him unaware of the risk of causing physical injury is "immaterial." ORS 161.125(2) ("When recklessness establishes an element of the offense, if the defendant, due to the use of the drugs * * * or voluntary intoxication, is unaware of a risk of which the defendant would have been aware had the defendant been not intoxicated, not using drugs * * *, such unawareness is immaterial.").

Convictions on Counts 2, 3, 7, and 10 reversed and remanded; remanded for resentencing; otherwise affirmed.