LANNY EARL BRENNER,
*Petitioner-Respondent*
*Cross-Appellant,*

*v.*

Mark NOOTH,
Superintendent,
Snake River Correctional Institution,
*Defendant-Appellant*
*Cross-Respondent.*

Malheur County Circuit Court
12089611P; A157914

391 P3d 947

Erin K. Galli, Assistant Attorney General, argued the cause for appellant-cross-respondent. With her on the opening brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General. With her on the reply and answering brief on cross-appeal were Ellen F. Rosenblum, Attorney General, and Paul L. Smith, Deputy Solicitor General.

Jesse Wm. Barton argued the cause and filed the briefs for respondent-cross-appellant.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Shorr, Judge.

## SHORR, J.

Defendant Mark Nooth, superintendent of the Snake River Correctional Institution (the state), appeals a post-conviction court judgment concluding that petitioner's trial attorney provided inadequate representation during his criminal trial for sexual abuse in the first degree, ORS 163.427, and granting petitioner post-conviction relief. The state argues that key evidence offered by petitioner in support of his claim of inadequate assistance of counsel would have been inadmissible at his criminal trial and that the post-conviction court erred in granting relief based at least in part on that evidence. Specifically, the state asserts that expert witness testimony proffered by petitioner was scientific evidence and that petitioner failed to show that, as such, it comported with the admissibility requirements specific to scientific evidence. As explained in this opinion, we agree with the state that key parts of the challenged testimony are scientific evidence and that petitioner failed to meet his burden of showing that that testimony would have been admissible at petitioner's criminal trial. We conclude further that, because that testimony was critical to petitioner's claim of inadequate assistance of counsel, the post-conviction court erred in concluding that petitioner suffered prejudice, and we reverse the post-conviction court's grant of post-conviction relief on that basis.[1]

The following facts, which are undisputed on appeal, are drawn from the record. Petitioner was a guest at a party where he became intoxicated. Early in the evening, a group of partygoers—including the victim, E, and her friend, A—were downstairs watching a violent movie. Petitioner, who was visibly drunk, came downstairs for about 30 minutes. Petitioner sat next to A while watching the movie and, when A's boyfriend left the room, petitioner made sexual comments to her, telling A that he wanted

---

[1] Petitioner raised four claims for relief to the post-conviction court. This opinion primarily addresses the state's appeal of the grant of relief based on petitioner's second claim for relief. Petitioner cross-appeals the post-conviction court's denial of his first claim for relief, which we affirm without written discussion. He also raises additional cross-assignments of error. We also reject those arguments without written discussion. Petitioner's third and fourth claims for relief were not the subject of any assignment of error on appeal or cross-appeal.

to have sex with her and mumbling something about her "boobs." After the movie ended, petitioner played a game of pool with E. Petitioner, who was slurring his speech and having trouble keeping his balance, told E that she was pretty. After playing pool, petitioner hugged E, although E "kind of stood back and didn't really want a hug." Around 1:00 a.m., petitioner had an emotional breakdown while with his sister. Petitioner was crying and saying repeatedly, "It wasn't me," and attempting to go home. Petitioner's sister believed petitioner may have been having a flashback related to his service in the Vietnam War. Petitioner's sister took his car keys because she was concerned about him driving while intoxicated, and then made up a bed for petitioner and left him to sleep.

E, A, and a third woman all went to sleep around 2:00 a.m. in a basement room, with E and the third woman sharing an air mattress. E awoke to the feeling of someone touching her back, and found petitioner touching her breasts and buttocks. E immediately noticed that her pants and underwear had been pulled down to her knees and that petitioner was "completely naked." E pushed petitioner away, but petitioner did not stop touching her until she pushed him "about two or three more times" and said, "[s]top." E later testified at the criminal trial that, after she told him to stop, petitioner "just kind of sat there for a little bit" and looked "like somebody snapping out of a trance." Petitioner picked up his clothes and walked into another room but returned a few minutes later and asked E if she was okay. E replied, "No. Go away." Petitioner then left. At some point, petitioner was seen coming up the stairs from the basement, naked, while several people were still hanging out in the house. He was described as mumbling and incoherent. Petitioner's sister took petitioner back to the bed that she had made for him, and petitioner went to sleep. In his subsequent statements to police, petitioner maintained that he had no recollection of going downstairs, taking off his clothing, or touching E.

At petitioner's criminal trial, his defense counsel did not contest that petitioner had touched E; rather, defense counsel emphasized the witness accounts of petitioner's intoxication to argue that, because petitioner was so drunk, he could not have acted "knowingly" as required

for a conviction in his case.[2] In his opening statement, petitioner's defense counsel referenced petitioner's military service in Vietnam and explained that the jury would hear evidence that the movie playing at the party was "particularly freaky" and "particularly scary," and "brought back memories of [petitioner's] Vietnam service." As a result, defense counsel explained, petitioner "dr[ank] and t[ook] his medication because he did not want to feel that way; he did not want to re-have those memories; he did not want to think about the war." During the trial, petitioner's sister testified that she believed that petitioner's emotional breakdown was related to his experience in Vietnam, but defense counsel did not introduce as evidence a mental health diagnosis for petitioner. Petitioner did not testify.

In closing, petitioner's defense counsel argued that, as a result of his intoxication, petitioner was "on autopilot" when he went downstairs and it was "just as likely" that petitioner was trying to get out of the house and go home when he wandered into the room where E was sleeping. Defense counsel further argued to the jury that petitioner was "feeling his way through" a dark and unfamiliar room when he touched E: "He doesn't know who she is. He doesn't know where he is. When he's told, 'No,' he stops." Petitioner's defense counsel then argued that petitioner's lack of memory was evidence that he lacked the required mental state:

> "I think I talked about it a little bit on jury selection when people are under anesthesia * * * you don't remember what happened, and again, I'm not bringing up lack of memory as excuse or as denial. Lack of memory is really— in this case is really a result of the extreme intoxication. That's what happens when somebody's either under anesthesia or extremely intoxicated."

At the conclusion of the trial, petitioner was found guilty by the jury of two counts of first-degree sexual abuse.

After petitioner's direct appeal was dismissed on his own motion, petitioner sought post-conviction relief, raising four claims of ineffective assistance of counsel. Petitioner's second claim, which is the focus of this opinion, asserted that

---

[2] The indictment in petitioner's case charged him with "unlawfully and knowingly" subjecting E to sexual contact.

petitioner's trial counsel "failed to develop a defense theory based on petitioner's health problems, including his military service-connected post-traumatic stress disorder (PTSD)." Petitioner asserted that his trial counsel should have been aware of evidence that petitioner was suffering from PTSD related to his military service and that petitioner abused alcohol to self-medicate and ease symptoms associated with that disorder. Petitioner claimed that his counsel could have leveraged those facts to develop a diminished capacity defense attacking the *mens rea* requirements of the sexual abuse charges[3] or a lack-of-volition theory attacking the *actus reus*.[4] Petitioner acknowledged that his trial counsel did present some evidence of his military history, mental health issues, and intoxication; however, he pointed out that the evidence was introduced by lay witnesses and argued that a defense such as he outlined required expert testimony to be effective. Petitioner argued that his trial counsel's failure to obtain and present expert witness testimony supporting that theory constituted inadequate assistance of counsel and necessitated a new trial.

In support of his claim, petitioner offered, among other things, the testimony of two experts: Dr. Robert Julien, a retired pharmacologist, and Dr. Bridget Cantrell, a mental health therapist. Prior to the post-conviction trial, the state moved to exclude the testimony of both witnesses and argued that neither expert's testimony would have been admissible in petitioner's criminal trial. As relevant to this appeal, the state argued that key parts of each expert's testimony amounted to scientific evidence and that, under the

---

[3] As noted previously, *see* 283 Or App at 872 n 2, defendant was charged with "knowingly" committing sexual abuse. Additionally, a conviction for first-degree sexual abuse requires proof that a defendant "subject[ed] another person to sexual contact." ORS 163.427. "Sexual contact" is defined, in part, as "any touching of the sexual or other intimate parts of a person * * * *for the purpose of arousing or gratifying the sexual desire of either party*." ORS 163.305(6) (emphasis added). Petitioner argues that his trial counsel could have used evidence of his PTSD and intoxication to negate either the "knowingly" mental state requirement or the specific intent requirement inherent in the "sexual contact" element of sexual abuse in the first degree.

[4] ORS 161.095(1) states that "[t]he minimal requirement for criminal liability is the performance by a person of conduct which includes a voluntary act or the omission to perform an act which the person is capable of performing." ORS 161.085(2) defines a "voluntary act," in relevant part, as "a bodily movement performed consciously."

admissibility requirements for scientific evidence set out in *State v. Brown*, 297 Or 404, 687 P2d 751 (1984), and *State v. O'Key*, 321 Or 285, 899 P2d 663 (1995), their testimony would have been inadmissible in petitioner's criminal trial because it lacked valid scientific foundation. In response, petitioner primarily argued that the admissibility requirements of *Brown* and *O'Key* did not apply to the testimony of Julien and Cantrell for various reasons that we address below. At the post-conviction trial, petitioner called Cantrell and Julien, whose testimony we discuss in detail as part of our analysis later in this opinion.

Following the post-conviction trial, the court granted petitioner post-conviction relief, ordering the judgment from his criminal trial vacated and the case returned for a new trial. In its judgment, the post-conviction court concluded that petitioner's counsel was deficient and that petitioner had suffered prejudice. The post-conviction court framed the issue underlying petitioner's second claim for relief as "whether [petitioner's] trial attorney properly evaluated the PTSD and alcohol issues." The post-conviction court noted that "[t]he bench and bar have recently become aware of the particular issues of veterans" and that petitioner's attorney had access to trainings and referrals related to veterans' issues but did not "call upon the resources available to evaluate the defense." The post-conviction court then concluded:

> "The best defense in this case is alcohol and PTSD. * * * [Defense counsel] needed an expert with the proper experience who could follow up and definitively diagnose PTSD. [Defense counsel] could have called on the VA system or one of the experts from the [Oregon Criminal Defense Lawyer's Association] training. He didn't."

The post-conviction court also found that the testimony of Cantrell and Julien would have been admissible at trial:

> "Both Julien and Cantrell qualify as expert witnesses based on their training and experience. They each have specialized knowledge and experience that would assist the trier of fact. Their testimony is admissible for this hearing and for trial. It would have then been up to a trial jury to decide what to do with that testimony. This court has certainly found it informative."

The post-conviction court then concluded that the expert witness testimony would have "affected [the] outcome":

"There is prejudice here. The experts would have testified to enough that there is a reasonable likelihood it would have affected [the] outcome."

The court did not specify which parts of the testimony it found helpful or that it believed would have affected the outcome of petitioner's criminal trial, and it did not determine whether any parts of the experts' testimony were scientific evidence or whether that evidence met any of the admissibility criteria discussed in *Brown* and *O'Key*.

On appeal, the state assigns error to the post-conviction court's determination that the testimony of Julien and Cantrell would have been admissible at trial and its decision to grant post-conviction relief based at least in part on that testimony. The parties largely reiterate to us the arguments that they made to the post-conviction court. The state contends that parts of the testimony of Julien and Cantrell are scientific evidence subject to the requirements of *Brown* and *O'Key* and that petitioner failed to meet his burden at the post-conviction trial of showing that the evidence would have been admissible at the criminal trial. The state argues further that, applying the admissibility criteria from *Brown* and *O'Key*, the science underlying parts of Julien's and Cantrell's testimony is invalid and therefore would have been inadmissible at trial. Petitioner argues that the testimony of Julien and Cantrell is not subject to *Brown* and *O'Key* but rather is governed only by the requirements applicable to all expert witnesses as stated in OEC 702. Petitioner further argues that Oregon's intoxication-defense statute, ORS 161.125, makes the testimony admissible.

Based on those arguments, the issue before us is whether the post-conviction court erred in concluding that the testimony of Julien and Cantrell would have been admissible at petitioner's criminal trial and, on the basis of that testimony, erred in granting petitioner a new trial. As we proceed to explain, we conclude that key parts of Julien's and Cantrell's testimony are "scientific" evidence. As the proponent of scientific evidence in a post-conviction proceeding, petitioner had the burden to show that the evidence

meets the admissibility requirements specific to scientific evidence. Because we conclude that petitioner failed to meet that burden, the post-conviction court erred in concluding that those parts of the testimony would have been admissible. As a result, petitioner failed to show that he was prejudiced by his counsel's performance at his criminal trial and, therefore, the post-conviction court erred in granting petitioner post-conviction relief as to his second claim.

We begin our analysis with an overview of our law regarding inadequate assistance of counsel. Petitioner raised claims for post-conviction relief under both the Oregon Constitution and the United States Constitution. A petitioner who seeks post-conviction relief on the ground that his trial counsel was inadequate must prove, by a preponderance of the evidence, facts demonstrating that his counsel failed to exercise reasonable professional skill and judgment and that the petitioner suffered prejudice as a result. *Trujillo v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991); *Strickland v. Washington*, 466 US 668, 687, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (the federal constitution requires "effective" assistance of counsel). Our analysis focuses on the second of those two prongs—whether petitioner showed that he suffered prejudice as a result of the alleged deficient performance of his attorney.

To prove prejudice under the Oregon Constitution, a petitioner must show that his counsel's deficient performance had "a tendency to affect the result of the prosecution." *Stevens v. State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995); *see also Green v. Franke*, 357 Or 301, 322-23, 350 P3d 188 (2015) (explaining that "the tendency to affect the outcome standard demands more than mere possibility, but less than probability," and that "the issue is whether trial counsel's acts or omissions *could have tended to affect* the outcome of the case" (emphasis in original; internal quotation marks omitted)). When a petitioner's claim is that his trial counsel was deficient for failing to investigate and pursue a particular trial strategy, as petitioner argues here, "the petitioner must adduce evidence at the post-conviction hearing that would have been discovered and *introduced* at the criminal trial had trial counsel undertaken the proposed investigation." *Short v. Hill*, 195 Or App 723, 729, 99 P3d

311 (2004), *rev den*, 338 Or 374 (2005) (emphasis added). That is, to show prejudice, the petitioner "must prove that investigation would have produced *admissible* evidence" that could have affected the outcome of the trial. *Tracy v. Nooth*, 252 Or App 163, 170, 285 P3d 745 (2012), *adh'd to on recons*, 255 Or App 435, 299 P3d 565, *rev den*, 353 Or 868 (2013) (emphasis added); *see also Holcomb v. Hill*, 235 Or App 419, 438, 233 P3d 448, *rev den*, 349 Or 370 (2010) (petitioner failed to show prejudice where testimony essential to his claim of ineffective assistance of counsel would have been inadmissible at trial). To prove prejudice under the federal constitution, a petitioner must demonstrate that there was a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 US at 694.

To summarize, to show that he was prejudiced by his trial counsel's failure to procure evidence, petitioner had to proffer evidence at the post-conviction trial that would have been admissible at his criminal trial and that had a tendency to affect the outcome of that trial.

The threshold question in this case is whether key parts of petitioner's expert witness testimony were scientific evidence. Whether evidence is "scientific" is a legal question that we review for legal error. *State v. Trujillo*, 271 Or App 785, 786, 353 P3d 609, *rev den*, 358 Or 146 (2015). Evidence is considered scientific if it "draws its convincing force from some principle of science, mathematics and the like." *Brown*, 297 Or at 407.

> "Under *Brown* and *O'Key*, scientific evidence is admissible if it is relevant under OEC 401, helpful to the trier of fact under OEC 702, and not subject to exclusion under OEC 403. Underpinning the entire admissibility analysis, however, is the requirement that the evidence be shown to be scientifically valid. To determine that issue, and depending on the nature of the evidence in question, a court may be required to consider a number of factors, including:
>
> > "'(1)  The technique's general acceptance in the field;
> >
> > "'(2)  The expert's qualifications and stature;
> >
> > "'(3)  The use which has been made of the technique;
> >
> > "'(4)  The potential rate of error;

"'(5)  The existence of specialized literature;

"'(6)  The novelty of the invention; and

"'(7)  The extent to which the technique relies on the subjective interpretation of the expert.'"

*State v. Perry*, 347 Or 110, 121, 218 P3d 95 (2009) (quoting *Brown*, 297 Or at 417 (internal citations and footnotes omitted)).

In determining whether proposed expert witness testimony is scientific evidence, and therefore subject to *Brown* and *O'Key*, the key issue is "whether the expert's assertions possess significantly increased potential to influence the trier of fact as scientific assertions." *State v. Marrington*, 335 Or 555, 562, 73 P3d 911 (2003) (internal quotation marks omitted). "In other words, if jurors would view the evidence as having 'an unusually high degree of persuasive power' because of the perception that it is based on scientific assertions, then the underlying foundation for the evidence must be valid." *State v. Dulfu*, 282 Or App 209, 214-15, 386 P3d 85 (2016), *rev allowed*, 361 Or 100 (2017) (quoting *O'Key*, 321 Or at 291-92). The line between nonscientific expert testimony and scientific expert testimony "may be fine, but it is not artificial." *State v. Rambo*, 250 Or App 186, 195, 279 P3d 361 (2012), *rev den*, 353 Or 203 (2013). "The distinction is that specialized expert opinion evidence based on a witness's training and experience draws its force from that training and experience, but not necessarily from the mantle of science." *State v. Cuevas*, 263 Or App 94, 109, 326 P3d 1242 (2014), *aff'd*, 358 Or 147, 361 P3d 581 (2015) (internal quotation marks and brackets omitted).

In this inquiry, we and the Supreme Court have considered the content of an expert's proffered testimony, the manner in which the expert is presented to the factfinder, and the relationship between the expert's conclusions and the expert's expertise. So, for example, an expert witness who has a background in science and who "claims that her knowledge is based on studies, research, and the literature in the field, announces to the factfinder that the basis of her testimony is 'scientific,' *i.e.*, is grounded on conclusions that have been reached through application of a scientific method to collected data." *Marrington*, 335 Or

at 563-64. Additionally, when an expert witness "couches her testimony in the vocabulary of scientific research," we have concluded that the expert "effectively announces to the jury that the basis of her testimony is 'scientific.'" *State v. Lusareta*, 270 Or App 102, 108, 346 P3d 514 (2015) (internal quotation marks and brackets omitted).

However, where an expert's testimony "did not involve the vocabulary of scientific research," was based on personal experience, and did not suggest to the court that the expert's opinions "were grounded on conclusions that have been reached through application of a scientific method to collected data," that testimony was not scientific evidence. *State v. Clemens*, 208 Or App 632, 639, 145 P3d 294 (2006), *rev den*, 342 Or 299 (2007) (internal quotation marks omitted); *see also Cuevas*, 263 Or App at 110 (expert witness's testimony not scientific where it was "explicitly framed in terms of [the expert's] own career, training, and experience," and "did not refer to studies, research, scholarly literature, or anything else that would cause a jury to infer that her testimony was based on more than her personal experience").

Turning to the evidence challenged in the present case, we conclude that the parts of Julien's and Cantrell's testimony challenged by the state—principally, the testimony of each regarding brain chemistry and its impact on petitioner's mental state—drew their persuasive force "from the mantle of science," *Cuevas*, 263 Or App at 109, and held "an unusually high degree of persuasive power" because a factfinder would have perceived them to be "based on scientific assertions," *Dulfu*, 282 Or App at 214.

We analyze Cantrell's and Julien's testimony separately, starting with Julien's testimony. His testimony to the post-conviction court largely breaks down into three components. First, Julien testified about the effect of alcohol on the brain and the role of memory—or, specifically, the lack of memory—as an indicator of an advanced state of intoxication that he termed "drug-induced reversible dementia," or "organic dementia." Second, Julien estimated petitioner's blood-alcohol content (BAC) at the time of the incident with E was at least 0.4 percent. And third, Julien testified that

it was his opinion to a degree of "medical certainty" that petitioner was in a state of "organic dementia" at the time he touched E and would have been "incapable of forming intent." On appeal, the state does not challenge the admissibility of Julien's estimate of petitioner's BAC; the state challenges only the first and third component described above—Julien's testimony related to brain chemistry, memory, and alcohol, and Julien's opinion as to petitioner's mental state at the time of the incident. Accordingly, the following analysis is confined to those aspects of Julien's testimony.

As noted, Julien testified at petitioner's post-conviction trial. Additionally, the post-conviction court admitted into evidence a separate declaration by Julien in which he stated that, having reviewed the files in petitioner's case, it was his opinion that, at the time of the incident, petitioner "could not meet the Oregon definition of intent or intentional behavior." Julien explained that petitioner "had no memory of the incident, demonstrating a state of alcohol-induced dementia. In this state, he lacked the ability to form intent as required to meet the Oregon definition of intent." Julien elaborated that, "[i]n other words, alcohol intoxication will prevent the formation of memories and the blood alcohol content can enable an individual to lack the ability to form memories or intentional behavior required to meet the Oregon definition of intent." Julien asserted that the opinions expressed in the declaration "constitute my conclusions to a degree of medical certainty based on information commonly relied upon by experts in my field." Julien added:

> "According to the standards of my profession, I have applied appropriate scientific principles as reliable [to] the facts of this case. The principles relied upon by me are supported by testing, common peer-reviewed articles, appropriate error rates, and their acceptability in the relevant scientific community."

In his testimony to the post-conviction court, Julien expanded on his opinion that, as a result of petitioner's intoxication and as evidenced by his lack of memory, petitioner was incapable of forming a culpable mental state at the time he touched E. In doing so, Julien first grounded his testimony in his scientific background and scholarship. Julien

described his educational and professional background, which included a series of undergraduate and advanced degrees in medicine and science, more than two decades practicing anesthesiology at a Portland-area hospital, and extensive teaching and scholarship in the areas of pharmacology and anesthesiology. He stated that he had written "the very first textbook on psychopharmacology," which was in its thirteenth edition. Julien explained that his textbook "had a chapter on alcohol, devoted to alcohol," and that he had "taught the pharmacology of alcohol for many, many years as part of my psychopharmacology teaching." Julien then explained:

> "[Alcohol] basically affects most of the brain, primarily acting at GABA and glutamate cells. In the hippocampus of the brain, the drug affects the formation of memory proteins by blocking the formation of these proteins off of your DNA. This is what is responsible for what is termed a 'blackout.' It's actually a state of drug-induced reversible dementia, just like the organic dementias that we see in society. My textbook has always called it 'drug-induced reversible dementia.' As part of that, and even before that, the drug depresses our frontal cortex, which makes up a large percentage of the human cortex, basically depressing those neurons and inducing a demented state by reducing neuronal activity."

Julien went on to explain that alcohol intoxication impairs the frontal cortex of the brain, which is responsible for "executive functioning," and that "the best index we have of executive functioning, the state of the frontal cortex, is by using the ability to form memory as a marker of impairment." Therefore, he asserted, the lack of memory from intoxication "is associated with major impairment of our executive functioning." Julien testified that, based on the amount of alcohol that petitioner reported drinking, he would have had a blood-alcohol content "to a degree of medical certainty in excess, at about or in excess of about .4 grams percent." Julien then testified as follows:

> "Q. When [petitioner] is in the blackout period that he doesn't remember, would you, from your knowledge of how much alcohol he drank, believe that he had diminished capacity?

"A.   Yes, ma'am.

"Q.   Would he have been able to form any type of criminal state of mind at that point?

"A.   He certainly would be incapable of forming intent. And I have authored a paper on that topic. He would have been—in my opinion, he would have been in a severely demented state, similar to somebody with an organic dementia like Alzheimer's dementia. And in that state, it is my opinion, one should be held to the same culpability as someone with organic dementia.

"Q.   So could you say to a reasonable medical certainty that he was, in fact, in that state of dementia on this day?

"A.   The estimated BAC, which is self-report, certainly would put one in a state of blackout or drug-induced dementia. And of course, that is self-report also, that someone says they cannot remember, but it's corroborated by an estimated BAC in which virtually everyone would be in that state.

"Actions in that state are often referred to as an autonomous state or somnambulism sleep activities. Others have referred to it as being mentally unconscious, although I don't believe there's a legal definition of conscious. But this would be someone that I could consider to be, you know, to be anesthetized."

In light of the foregoing, we conclude that the challenged aspects of Julien's testimony—his testimony related to brain chemistry, memory, and alcohol, and his opinion as to petitioner's mental state at the time of the incident— are scientific evidence. Julien presented himself as a scientific researcher and asserted that his knowledge was "based on studies, research, and the literature in the field," and "grounded on conclusions that have been reached through application of a scientific method to collected data." *Marrington*, 335 Or at 563-64. Further, Julien's trial testimony was couched "in the vocabulary of scientific research," *Lusareta*, 270 Or at 108, and fundamentally drew its persuasive force not from Julien's personal experience, but "from the mantle of science," *Cuevas*, 263 Or App at 109.

The essence of Julien's testimony was not all that different from what petitioner's trial counsel asserted in

his arguments to the jury: Petitioner was too intoxicated to have "knowingly" touched E and that the jury could judge petitioner's intoxication by his lack of memory. Julien's testimony, however, is significantly more persuasive precisely because of Julien's scientific background and expertise, and his use of scientific research and principles to reinforce that assertion. In sum, Julien's testimony "draws its convincing force from some principle of science, mathematics and the like," and the trier of fact would have perceived the testimony as "scientific" evidence. *Brown*, 297 Or at 407.[5]

We turn now to consider Cantrell's proffered testimony. Cantrell's testimony can be summarized as follows: (1) she had diagnosed petitioner with PTSD, among other mental health disorders; (2) she believed that petitioner's PTSD had been triggered by various events the day of the party and that those events drove petitioner to drink heavily so as to "self-medicate" the anxiety he was feeling; (3) PTSD can cause a surge of adrenaline that can interfere with a person's mental functioning; and (4) it was her opinion, "at the time of the incident, that [petitioner] was operating at a diminished capacity, due to the fact that his adrenaline interfered with his higher level cognitive functioning." The state challenges only the last two of those components of Cantrell's testimony, and we narrow our analysis accordingly.

At the post-conviction trial, the post-conviction court admitted into evidence a report by Cantrell in which she concluded that petitioner "meets the clinical criteria for Post Traumatic Stress Disorder, Depression, Anxiety, Alcohol Abuse and Sleep Disorder." Cantrell stated in her report that, having interviewed petitioner, it was her opinion that

---

[5] We note that we have previously considered the exclusion of similar testimony by this same expert, Julien, albeit in a different context. In *State v. Hazlett*, 269 Or App 483, 495, 345 P3d 482 (2015), we concluded that a trial court erred in excluding testimony by Julien that was similar to the testimony at issue in this case—in short, that intoxication could result in a state of dementia that effects a person's ability to form intent. In *Hazlett*, however, the issue was whether the trial court had erred in concluding that Julien was not "qualified" to render that testimony, as required by OEC 702, because he was a pharmacologist and not a psychologist. *Id.* at 494. We did not consider in *Hazlett* whether Julien's proposed testimony was scientific evidence and, if so, whether the science underlying that testimony comported with the requirements of *Brown* and *O'Key*.

he was "triggered by multiple events" prior to and during the party, particularly the violent movie, which "triggered flashbacks" to traumatic events petitioner had experienced during his service in the Vietnam War. As a result of those events and petitioner's ingrained military training and experience, Cantrell explained, petitioner "automatically reverted to his intrinsic skills of survival. This is initiated and primed through the activation of neuro-chemicals and adrenaline with the objective only to survive." Cantrell ultimately concluded that, at the time petitioner touched E, he "was operating at a diminished capacity, due to the fact that his adrenaline interfered with his higher level cognitive functioning."

In her testimony at the post-conviction trial, Cantrell described herself as a mental health counselor and a "certified trauma specialist" with expertise in PTSD. She noted that she had a doctorate in clinical psychology, that her research during graduate school focused on PTSD, and that she had written books on the subject as well. She testified that she had diagnosed petitioner with PTSD and that sufferers of PTSD frequently use alcohol to "numb out their feelings, their emotional pain. We call that 'self-medication.'" She stated that petitioner was "already in a state of arousal" when he arrived at the party, that "there were indicators" during the evening that petitioner "was having some issues with some post-traumatic stress behaviors," and that the violent movie "activated" him.

On cross-examination, Cantrell was pressed to explain her conclusion that petitioner was operating at diminished capacity as a result of the adrenaline in his system. Cantrell stated, "My understanding, when I look at post-traumatic stress, when I look at how the effects of adrenaline on someone's cognitive ability, their executive functioning diminishes under the influence of a substance and under the influence of adrenaline." When pressed further, Cantrell explained that "I would say that it affects judgment and it affects the higher functioning of executive functioning." Cantrell also explained that PTSD "puts [veterans] back into their primal level function and it takes away their ability to make higher-level function capabilities. Their executive functioning is not intact and * * * they resort

back to the primal level of function * * * we call it the 'reptilian brain' in my world."

As with Julien, we conclude that Cantrell's testimony related to brain chemistry and functioning, and its relationship to petitioner's mental state, would be perceived by a factfinder as scientific. In considering Cantrell's testimony, the Oregon Supreme Court's opinion in *Marrington* is instructive. In *Marrington*, the court considered whether the testimony of a "program manager and clinical supervisor" at a private nonprofit organization that specialized in treatment of sexually abused children was "scientific" evidence. 335 Or at 558. At issue was the witness's assertion that "delayed reporting" was "a predominant feature of disclosure in otherwise verified cases of child sexual abuse." *Id.* at 560. The court noted that

> "this court has made it clear that expert testimony concerning matters within the sphere of the behavioral sciences possesses the increased potential to influence the trier of fact as scientific assertions, just as expert testimony dealing with the 'hard' sciences does."

*Id.* at 561; *see also Jennings v. Baxter Healthcare Corp.*, 331 Or 285, 304, 14 P3d 596 (2000) (scientific evidence subject to requirements of *Brown* and *O'Key* even though science involved is not "hard" science). Turning to the witness's testimony, the court in *Marrington* emphasized that the expert witness had stated that she held "undergraduate and postgraduate degrees in the field of psychology, a behavioral science" and that she was "licensed by the State of Oregon and is a nationally certified counselor." 335 Or at 562. Further, she had "stated that she was familiar with the 'recent literature and research in the area of sexual abuse of children.' The reference to 'research' implies a scientific foundation, with the results published in the 'literature' of the area of study." *Id.* at 563. The court noted that the witness's testimony involved "the vocabulary of scientific research" and that she implied that her theories had been confirmed empirically. *Id.* The court then concluded:

> "An expert like [this witness], who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field,

announces to the factfinder that the basis of her testimony is 'scientific,' *i.e.*, is grounded on conclusions that have been reached through application of a scientific method to collected data. Because that is how the factfinder would understand it, a court has a duty to ensure that such information possesses the necessary indices of scientific validity."

*Id.* at 563-64.

Similarly, Cantrell is an expert "who has a background in behavioral sciences and who claims that her knowledge is based on studies, research, and the literature in the field." *Id.* Her testimony describing how PTSD affects brain functioning involved the vocabulary of scientific research and scientific jargon. Of particular significance, Cantrell, at various points in her testimony, implied that her opinions or assertions came not from her personal experience, but could be attributed generally to her field—for example, stating that "*we* call [PTSD sufferers' use of alcohol] 'self-medication'" or, in describing changes to the brain when PTSD is triggered, stating that "*we* call it the 'reptilian brain' in my world." (Emphases added.) A jury would have perceived her testimony related to PTSD's effect on brain chemistry, and its relationship to petitioner's mental state, as scientific and, accordingly, we conclude it is scientific evidence subject to the requirements of *Brown* and *O'Key*.

As the proponent of scientific evidence, petitioner had the burden of showing at the post-conviction trial that such evidence would have been admissible at the criminal trial. *Tracy*, 252 Or App at 170. In assessing whether scientific evidence is admissible, a reviewing court considers the various factors outlined in *Brown* and *O'Key*. As noted, the factors listed in *Brown* include "general acceptance in the field," "potential rate of error," the existence of "specialized literature," and the "novelty" of the scientific assertions at issue. *Brown*, 297 Or at 417; *see* 283 Or App at 877-78. In *O'Key*, the Oregon Supreme Court incorporated additional, largely overlapping, factors articulated by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 US 579, 113 S Ct 2786, 125 L Ed 2d 469 (1993). 321 Or at 306. Those four factors are (1) "whether the theory or technique in question can be (and has been) tested";

(2) "whether the theory or technique has been subject to peer review and publication"; (3) "the known or potential rate of error and the existence of operational standards controlling the technique's operation"; and (4) "the degree of acceptance in the relevant scientific community." *Id.* at 303-05 (internal quotation marks omitted). The Oregon Supreme Court has emphasized that the factors in *Brown* and *O'Key* "are not exclusive and are not to be used as a mechanical checklist requiring an affirmative finding with respect to each factor"; rather, "[w]hatever factors may be relevant in a particular case, the party offering the scientific evidence at issue *** has the burden of establishing that it is scientifically valid." *Perry*, 347 Or at 122.

Despite the state's objection that the proposed testimony was scientific evidence, petitioner did not seriously undertake to demonstrate to the post-conviction court that the science underpinning the challenged assertions by Cantrell and Julien was valid under the factors outlined in *Brown* and *O'Key*.[6] More importantly for this appeal, petitioner does not even argue before us that he met the requirements of *Brown* and *O'Key*. Rather, he contends that Julien and Cantrell did not present "scientific" evidence as contemplated by *Brown* and *O'Key* and that their testimony would have been admissible for other reasons.[7]

First, petitioner argues that Julien's and Cantrell's testimony would have been admissible under the Oregon evidence rule regulating the use of expert witnesses, OEC 702, which states:

> "If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

---

[6] In opposing the state's motion to exclude Julien's testimony, petitioner, in a footnote, cited to three articles apparently dealing with scientific studies relating to alcohol and the brain. However, those articles were not admitted into evidence at the post-conviction trial and do not otherwise appear in the record.

[7] In addition to the arguments summarized above, petitioner made other, less-developed arguments throughout the post-conviction proceedings, as well as on appeal before us, as to why the testimony of Julien and Cantrell is admissible. We reject those arguments without discussion.

Petitioner contends that both Julien's and Cantrell's testimony would have been admissible under OEC 702 solely as "technical or other specialized knowledge" and therefore was not "scientific" evidence. As such, petitioner argues, it was subject only to the general requirements of OEC 702: that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue," and that the witness be "qualified as an expert by knowledge, skill, experience, training or education." The post-conviction court appeared to adopt this reasoning when it stated in its general judgment that "[b]oth Julien and Cantrell *qualify as expert witnesses based on their training and experience.* They each have *specialized knowledge* and experience that *would assist the trier of fact." See* 283 Or App at 874 (emphases added).

However, as we have just discussed, we conclude that the challenged evidence is scientific and, as scientific evidence, it is subject to the additional requirements of *Brown* and *O'Key.* As noted in *Brown,* the legislature, in adopting OEC 702, explicitly left it to the courts "to adopt a new approach to the admissibility of scientific evidence." 297 Or at 408 (noting that the legislative commentary to OEC 702 states that the legislature "leaves for judicial decision the standard to be used in determining the admissibility of novel scientific evidence"). The Supreme Court did that in *Brown,* and again in *O'Key,* and the criteria of those cases apply here.

Second, petitioner argues that, because the legislature has enacted a statute authorizing a voluntary intoxication defense to rebut the mental state element of a crime, the scientific validity of Julien's testimony has already been accepted by the legislature and his testimony is therefore admissible. Petitioner cites ORS 161.125(1), which states:

"The use of drugs or controlled substances, dependence on drugs or controlled substances or voluntary intoxication shall not, as such, constitute a defense to a criminal charge, but in any prosecution for an offense, evidence that the defendant used drugs or controlled substances, or was dependent on drugs or controlled substances, or was intoxicated may be offered by the defendant whenever it is relevant to negative an element of the crime charged."

Accordingly, petitioner argues, any concerns about the validity of Julien's theory went to the weight afforded that evidence by the factfinder, not its admissibility. However, petitioner is mistaken that ORS 161.125(1) creates blanket admissibility for any and all evidence related to a criminal defendant's intoxication. Rather, that statute speaks to the *relevance* of such evidence; evidence offered for that purpose still must meet any applicable requirements for admissibility.

In sum, petitioner offered testimony by Julien and Cantrell in support of his claim for post-conviction relief. Parts of the testimony of each expert witness would have been perceived by a factfinder as scientific, and therefore constitute "scientific" evidence subject to the requirements of *Brown* and *O'Key*. As explained, petitioner had the burden of proving before the post-conviction court that such testimony would have been admissible at trial. Petitioner did not meet that burden with regard to Julien's testimony that (1) a person's lack of memory is an indicator that the person is in a state of "organic dementia" and, therefore, is unable to possess a culpable mental state, and (2) in his opinion, petitioner was in such a state at the time he groped E and, therefore, was incapable of forming intent, or was in an "autonomous state" and "mentally unconscious." Petitioner also did not meet that burden with regard to Cantrell's testimony that (1) PTSD can cause a surge of adrenaline that affects brain functioning, and (2) it was her opinion that petitioner was operating at diminished capacity at the time he touched E as a result of PTSD-triggered adrenaline interfering with his cognitive functioning. Because petitioner failed to establish that those parts of Julien's and Cantrell's testimony were admissible, the post-conviction court erred in concluding that the testimony would have been admissible at petitioner's criminal trial.

We pause to note that, in this opinion, we do not rule on the actual validity of the science underlying each expert's testimony. The issue in this case is whether petitioner proved at his post-conviction proceeding that his trial counsel's allegedly deficient representation prejudiced petitioner. As we have noted, prejudice in this case required a

showing that the relevant evidence would have been admissible at his trial which, in turn, required petitioner to prove that the proffered testimony of Cantrell and Julien, as scientific evidence, met the requirements of *Brown* and *O'Key*. We conclude only that petitioner did not meet that burden and, as a result, that the post-conviction court erred in determining that Julien's and Cantrell's testimony would have been admissible at his trial.

Because our ruling pertains only to the challenged parts of that testimony, other parts of Julien's and Cantrell's testimony—such as Julien's estimate of petitioner's BAC and Cantrell's diagnosis of petitioner's military service-related PTSD—are untouched by this opinion. We turn now to consider whether, in the absence of the challenged testimony, the record before us nevertheless supports the post-conviction court's finding of prejudice on petitioner's second claim. Whether petitioner has demonstrated prejudice is a question of law. *Ashley v. Hoyt*, 139 Or App 385, 399 n 8, 912 P2d 393 (1996).

Petitioner's claim of inadequate assistance of counsel to the post-conviction court was that his attorney was constitutionally deficient for failing to develop a defense theory based on petitioner's military history, his PTSD, and his intoxication. Although petitioner's counsel did, in fact, touch on each of those themes in arguing to the jury for an acquittal, petitioner asserted in his claim that his attorney was nevertheless ineffectual because he failed to procure expert witness testimony. Specifically, petitioner argued that such expert witness testimony could have affected the outcome of the trial by negating either the *mens rea* requirements of petitioner's charges or the volitional act requirement of the *actus reus*. The post-conviction court appeared to adopt that reasoning, concluding in its judgment that "[t]he best defense in this case is alcohol and PTSD," and that petitioner's trial counsel was deficient by failing to call on veteran-specific resources in preparing the case. In finding that petitioner suffered prejudice, the post-conviction court highlighted the testimony of the expert witnesses, but stated only that "[t]he experts would have testified to enough that there is a reasonable likelihood it would have affected the outcome."

However, as explained in this opinion, the same evidence petitioner advanced to undercut the *mens rea* or *actus reus* elements of petitioner's offense is the same evidence we conclude should have been excluded by the post-conviction court because petitioner failed to establish a scientific foundation for its admissibility. So, although the state does not challenge Cantrell's testimony regarding petitioner's military history, her diagnosis of PTSD, and her opinion that petitioner's PTSD was triggered the night of the party, without some evidence explaining how those issues could have affected petitioner's mental state, there is little likelihood that her unchallenged testimony could have affected the outcome of the case. *See Green,* 357 Or at 322-23 (explaining that "the tendency to affect the outcome standard" for showing prejudice "demands more than a mere possibility, but less than probability"). The necessary link between Cantrell's unchallenged testimony and the elements of petitioner's criminal charge was Cantrell's *challenged* testimony that petitioner's PTSD-related adrenaline rush "interfered with his higher level cognitive functioning" and resulted in petitioner operating at a "diminished capacity." But, as we have explained, petitioner failed to lay the necessary foundation for that testimony and the post-conviction court erred in concluding that it would have been admissible. Without that linking testimony, we cannot say that Cantrell's unchallenged testimony had a tendency to affect the outcome. Nor can we say that, but for counsel's error, there is a reasonable probability that the outcome of petitioner's trial would have been different.

As to Julien's testimony, although the state does not challenge the pharmacologist's estimate of petitioner's BAC, that evidence is not so different from the various eyewitness accounts of petitioner's heavy intoxication that were admitted at petitioner's criminal trial such that we could conclude that the inclusion of Julien's BAC analysis would have had a tendency to affect the outcome. Rather, the parts of Julien's testimony that could have affected the outcome of petitioner's criminal trial are those parts that cast doubt on whether petitioner could have acted consciously, "knowingly," or with the required intent—*viz.,* Julien's testimony discussing the link between alcohol, memory, and intentional behavior, and

Julien's assertion that petitioner's lack of memory indicated that he was in a state of dementia in which he "could not meet the Oregon definition of intent or intentional behavior." As with Cantrell, those parts of Julien's testimony required a scientific foundation and, without such a foundation, cannot prove prejudice in his case. Accordingly, we conclude that, for the reasons above, petitioner failed to show that he was prejudiced by his trial counsel's failure to procure expert testimony related to his military history, PTSD, and alcohol issues. The post-conviction court erred in so concluding.

That would ordinarily conclude our review—that is, having concluded that the post-conviction court erred in granting petitioner post-conviction relief as to his second claim, we would simply reverse that part of the judgment but otherwise affirm. However, the circumstances here are not ordinary.

As previously noted, 283 Or App at 870 n 1, petitioner raised four claims to the post-conviction court. In his fourth claim for relief, petitioner argued to the post-conviction court that his trial counsel was ineffective for failing to move to merge his two "convictions." In its judgment, the post-conviction court stated that, as to the fourth claim, "[t]he two convictions should have merged." Ultimately, the court entered a judgment providing, in pertinent part:

"Petitioner's petition for [post-conviction relief] is granted. Judgment from trial court vacated and the matter returned for new trial."

Having now concluded that the post-conviction court erred in granting petitioner post-conviction relief as to his second claim, the post-conviction court must reassess the relief, if any, to which petitioner is entitled. Accordingly, we reverse the judgment and remand for the post-conviction court to enter a judgment consistent with this opinion.

On appeal, reversed as to petitioner's second claim for post-conviction relief and remanded for entry of judgment consistent with this opinion. On cross-appeal, affirmed.